**FILED**

Jeanne A. Naughton, CLERK

**November 6, 2020**

United States Bankruptcy Court
Newark, NJ

By: *Juan Filgueiras*

Juan Filgueiras, Court Room Deputy

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>S B BUILDING ASSOCIATES LIMITED PARTNERSHIP,<br><br>Debtor. | Case No.:    13-12682  VFP<br><br>Chapter    11 |
| In re:<br><br>SB MILLTOWN INDUSTRIAL REALTY HOLDINGS, LLC,<br><br>Debtor. | Case No.:    13-12685 VFP |
| In re:<br><br>ALSOL CORPORATION,<br><br>Debtor. | Case No.:    13-12689 VFP<br><br>Jointly Administered |

## OPINION ON CONFIRMATION

### APPEARANCES

BERGER & BORNSTEIN, PA
Lawrence S. Berger, Esq.
237 South Street
Morristown, NJ  07960
Attorneys for Debtors

RABINOWITZ, LUBETKIN & TULLY, LLC
Jay L. Lubetkin, Esq.
John J. Harmon, Esq.
393 Eisenhower Parkway, Ste. 100
Livingston, NJ  07039
Attorneys for Debtors

THOMPSON & KNIGHT, LLP
Stuart J. Glick, Esq.
900 Third Avenue, 20th Floor
New York, NY  10022
Attorneys for Cherry Tree Property
and SASS MUNI IV, V, and VI

GIBBONS P.C.
Mark Conlan, Esq.
Thomas Valen, Esq.
David N. Crapo, Esq.
One Gateway Center
Newark, NJ  07102-5310
Attorneys for Boraie Development

OFFICE of the UNITED STATES TRUSTEE       NORRIS MCLAUGHLIN, P.A.
Benjamin Teich, Esq.                      Morris S. Bauer, Esq.
One Newark Center                         400 Crossing Boulevard, 8th Floor
Ste. 2100                                 P.O. Box 5933
Newark, NJ 07102                          Bridgewater, New Jersey 08807
                                          Former Attorneys for Debtors

**VINCENT F. PAPALIA, Bankruptcy Judge**

## I. <u>INTRODUCTION</u>

In these cases, the Court is faced with an unusual, if not unique, situation.  The Plans proposed by these Debtors (collectively, the "Plan"): (a) provide for a 100% dividend to unsecured creditors, with interest; (b) were overwhelmingly accepted by every secured and unsecured class that voted; (c) the classes of secured creditors that did not vote -- the EPA, Milltown and certain tax lien certificate holders -- have either entered into settlements with the Debtors and/or are being paid in full, are retaining their liens and have not objected to the Plan; and (d) at least as importantly, the Plan is based upon settlements that resolve complex, multiparty litigations with the EPA, the Sass Parties and Milltown that have been pending for many years.  Those settlements will put to an end hotly contested, multimillion dollar claims by and against the Debtors and were entered into only after hard-fought negotiations and multiple mediation sessions.

Against that backdrop, two parties interposed substantial and, for the most part, well founded objections:  Boraie Development, LLC ("Boraie") and the Office of the United States Trustee ("UST"), with Boraie being the only objecting creditor.  As for Boraie, it is participating in this case by virtue of purchasing claims against two of the three Debtors, Alsol and S B Building (but not SB Milltown), totaling approximately $108,000.  As noted, those claims are proposed to be paid in full, with interest. The natural question then becomes why is Boraie objecting.

The answer lies outside typical debtor-creditor relations.  Boraie is the designated Redeveloper of the Debtors' Properties (as defined below).  Boraie and the Debtors have been

enmeshed in protracted litigation revolving around the development of the Debtors' Properties in the trial and appellate courts of New Jersey for nearly fifteen years. Significantly, the Debtors' Plan expressly leaves unaffected Boraie's rights against the Debtors as Redeveloper and with respect to the pending State Court litigation. The UST has no direct economic stake in this (or any other) bankruptcy proceeding but is properly exercising its statutory right and duty to oversee bankruptcy proceedings and enforce the bankruptcy laws. In sum, the objections here – substantive though they may be – are being made by a creditor that is to be paid in full, but which also has a very different and primary interest that it is pursuing as the Redeveloper of the Debtors' Properties, and the UST, who is not a creditor at all.

Boraie and the UST argue that the Debtors' Plan is unconfirmable as a matter of law and fact for numerous reasons and that these cases should be converted to cases under Chapter 7 or that a Chapter 11 Trustee should be appointed. The objections of Boraie and the UST may be summarized as follows:

1. The Debtors will be unable to pay administrative expenses required under the Plan in full on the Effective Date (or as may otherwise be agreed by administrative claimants);

2. The Debtors' Plan is not feasible for various reasons, including the lack of sufficient capital and available cashflow from the Debtors and its "backstop" – United States Land Resources, Inc. ("USLR") – to fund the initial, installment and balloon payments due under the Plan;

3. The Plan was not proposed in good faith and not by any means forbidden by law;

4. The continued management of the Debtors by Lawrence S. Berger is not in the interests of creditors or the public;

5. The provisions of the Plan and Global Settlement (as defined below) that call for cross-collateralization are not permitted as a matter of law;

6. The provisions of the Plan and Global Settlement that call for temporary or "deemed" substantive consolidation are also not permitted as a matter of law;

7. The Plan is being funded (at least in part) by alleged fraudulent transfers;

8. The Plan may be confirmed only under 11 U.S.C. § 1129(b) because not all impaired classes have affirmatively voted to accept the Plan – i.e., the EPA, Milltown, the tax lien certificate holders – as required for confirmation under 11 U.S.C. § 1129(a)(8). Thus, section 1129(b) applies, and the Plan does not satisfy its "fair and equitable" and "no unfair discrimination" requirements, principally because of the Plan's consolidation and/or cross-collateralization provisions and the related argument that the Plan violates the absolute priority rule.

The Court will address each of these arguments following a discussion of the lengthy procedural and factual history of these cases.

## II.   **GENERAL BACKGROUND**

This Opinion is being issued after trial on the vigorously contested confirmation hearing of three jointly administered Chapter 11 cases, *In re S B Building Limited Partnership* ("S B Building") Case No. 13-12682 (VFP); *In re SB Milltown Industrial Realty Holdings, LLC* ("SB Milltown") Case No. 13-12685 (VFP); and *In re Alsol Corporation* ("Alsol") Case No. 13-12689 (VFP) (collectively, the "Debtors").  The trial took place intermittently over ten days and was followed by a change of counsel for the Debtor, two rounds of post-trial briefings, two motions to reopen the hearing in order to supplement the trial record (one granted and one granted in part), and one motion to strike certain testimony of Debtor's principal (granted in part).[1]  Additionally, during the trial, the evidentiary hearings were suspended for an extended period while the parties

---

[1] The trial transcripts referenced throughout this Opinion are defined in the following manner:
Trial Tr. vol. 1, Apr. 26, 2018, Dkt. No. 515.
Trial Tr. vol. 2, May 4, 2018, Dkt. No. 516.
Trial Tr. vol. 3, May 16, 2018, Dkt. No. 521.
Trial Tr. vol. 4, May 23, 2018, Dkt. No. 534.
Trial Tr. vol. 5, June 20, 2018, Dkt. No. 544.
Trial Tr. vol. 6, Aug. 15, 2018, Dkt. No. 575.
Trial Tr. vol. 7, Sept. 17, 2018, Dkt. No. 584.
Trial Tr. vol. 8, Mar. 27, 2019, Dkt. No. 621.
Trial Tr. vol. 9, Apr. 8, 2019, Dkt. No. 624.
Trial Tr. vol. 10, Apr. 10, 2019, Dkt. No. 625.

engaged in settlement discussions among themselves, as well as with the Court (with the consent of the parties), that were ultimately unsuccessful.

As noted, the two primary objecting parties are Boraie, which was appointed prepetition as Redeveloper of the Debtors' Properties, and the UST. The Court-appointed examiner, Frank A. Pina, and his retained attorneys and accountants, Trenk, DiPasquale, Della Fera & Sodono, P.C., and Mercadien, P.C., respectively, also have a standing Objection preserved under a December 18, 2018 Consent Order for the payment of their fees in the capped amount of $400,000.

Tax certificate holders Cherry Tree Property, LLC; Sass Muni IV, LLC; Sass Muni V, LLC; and Sass Muni VI, LLC (collectively, "Sass") filed a June 14, 2019 letter of counsel in support of confirmation.[2] The United States Environmental Protection Agency (the "EPA") also filed a letter in support of the Global Settlement, which is the cornerstone of the Debtors' Plan. Subsequently, the EPA advised the Court that it had no objection to confirmation of the Plan.[3]

### III.   JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on September 18, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L) (confirmation of plans) and (O). Venue is proper in this Court under 28 U.S.C. § 1408. The Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

---

[2] June 14, 2019 Stuart J. Glick, Esq. Letter, Dkt. No. 638.
[3] Nov. 6. 2017 Andrew Keir, Esq. Letter, Dkt. No. 436.

## IV.    STATEMENT OF FACTS

### A. General Background

The Debtors together own twenty-four acres of contiguous property in the Borough of Milltown, Middlesex County, New Jersey (collectively, the "Properties"), formerly zoned for industrial use and once used in part as a Michelin tire facility.[4]  Alsol acquired its tracts of the property in 1940s; S B Building in 1986; and SB Milltown in 2004.[5]  The S B Building tracts include commercial buildings, a single-family home and vacant land.[6]  The SB Milltown tracts include one building leased to an unrelated tenant; other buildings were demolished.[7]  All buildings on the Alsol tract are demolished, and none were under lease during this Chapter 11 case.[8]  The three Debtors had a total of two tenants as of March 27, 2019.[9]  The Debtor(s) acquired these Properties for commercial investment, both (i) to be operated as commercial or industrial rentals; and (ii) to be redeveloped for commercial and/or residential use.[10]  Lawrence S. Berger, Esq. ("Mr. Berger") signed the petition of each of the three Debtors "as authorized agent or as President."[11] The Debtors described their ownership structure a follows:

> S B Building wholly owns co-debtors SB Milltown and Alsol.
>
> S B Building is owned 50% by Success Treuhand GMbH (limited partner); and 50% by S B Building GP, LLC.

The Disclosure Statement describes Mr. Berger as a general partner of S B Building GP, LLC.[12]

> Debtor S B Building is also the sole owner of:

---

[4] Fourth Modified Disclosure Statement, Art. II.A.2, at 7-8, Dkt. No. 483 ("Fourth Modified DS").
[5] Fourth Modified DS, Art. II.A.1, at 6, Dkt. No. 483.
[6] Debtor Br. ¶ 20, Dkt. No. 637.
[7] Debtor Br. ¶ 21, Dkt. No 637.
[8] Debtor Br. ¶ 22, Dkt. No. 637.
[9] Debtor Br. ¶ 28, Dkt. No. 637.
[10] Debtor Br. ¶ 25, Dkt. No. 637.
[11] UST Proposed Statement of Facts ¶ 6, Dkt. No. 641 ("UST Facts").
[12] Fourth Modified DS, Art. II.B, at 8, Dkt. No. 483.

(i)    388 Route 22 Readington Holdings, LLC ("388 Route 22"), which owns a vacant 60,000 square foot building on six acres and which the Debtors estimated had a value of $6 million, with $3 million in liabilities and was the debtor in Case No. 13-26699 (MBK) (Chapter 11).   That case was confirmed on October 7, 2015. Subsequently, 388 Route 22 defaulted under its confirmed plan and filed a second case in 2018.[13]   That later case was converted to Chapter 7, and the 388 Route 22 property was sold by the Chapter 7 Trustee over that debtor's objection for a price of $3.2 million.[14]

(ii)    Route 35 Wall Holdings, LLC, which owned a vacant 80,000 square-foot building on eight acres and which the Debtors estimated to have a value of $7 million, with $7 million in liabilities.   Sass Muni VI, LLC, which is also Debtors' creditor (among other Sass Muni entities), took title to the property on a tax foreclosure.   Route 35 Wall Holdings, LLC has no other assets.[15]

**B.    Pre- and Post-Petition Litigation History**

These Debtors were involved in multiple complex litigations both pre- and post-petition, all of which are being resolved by the Global Settlement (except for the litigation with Boraie). The following summary of the Debtors' extensive pre- and post-petition litigation history is derived from the submissions of the parties in these cases.

(1) The *Mount Laurel* and Condemnation Litigation

In a May 8, 2001 resolution, the Borough of Milltown ("Milltown") designated the Debtors' Properties as a Redevelopment Site.[16]   Milltown created the Ford Avenue Redevelopment Agency (the "Agency") on September 10, 2001 and passed an ordinance on April 22, 2002 to promote the development of the site.[17]   After further municipal proceedings in 2002 (requests for proposals and the like), Milltown designated Boraie to be the redeveloper (the "Redeveloper") of the site under an original Redevelopment Agreement dated May 11, 2004 (amended thereafter).[18]

---

[13] *In re 388 Route 22 Readington Holdings, LLC*, Case No. 18-30155 (KCF) (Ch. 11).
[14] Jan. 29, 2019 Sale Order, Dkt. No. 119, Case No. 18-30155 (KCF).
[15] Fourth Modified DS, Art. IBM, at 8, Dkt. No. 483.
[16] Boraie's Objection to the Debtors' motion to approve settlement with the Sass Entities ¶ 6, June 20, 2017, Dkt. No. 337 ("Boraie Obj."). It is accompanied by the Declaration of Mark B. Conlon, Esq., which serves as an index to Boraie's Exhibits, Dkt. No. 337-1 ("Conlon Decl.").
[17] Boraie Obj. ¶¶ 7-8, Dkt. No, 337.
[18] Boraie Obj. ¶ 9; May 11, 2004 Redevelopment Agreement, at 2, Ex. A, Dkt. No. 337.

Boraie filed an application for approval of its site development plan, but before that process was complete, Debtors filed a November 30, 2006 five-count Complaint in Superior Court of New Jersey, Law Division, Middlesex County, Dkt. No. MID-L-9439-06 against Milltown, Boraie, Middlesex County (and subdivisions thereof) for the following declaratory and injunctive relief (the "*Mount Laurel* Litigation"):

> (1)    granting a *Mt. Laurel* builder's remedy to increase permitted density on Debtors' property;

> (2)    declaring that Defendant Boraie has no standing to pursue and/or obtain any approval from the Defendant Planning Board;

> (3)    prohibiting the Agency from pursuing and/or obtaining a New Jersey Department of Environmental Protection (NJDEP) Letter of Interpretation (LOI);

> (4)    declaring that Defendant Boraie's agreement to contribute $1 million for a new fire house [a provision of the May 11, 2004 Redevelopment Agreement] is an illegal exaction prohibited under the Municipal Land Use Law (MLUL); and

> (5)    enjoining the Defendant County from condemning a four-acre portion of the Site for public open use.[19]

On Defendants' motion for summary judgment, by Decision and Order entered on June 12, 2007, the State Court dismissed Counts 2, 3 and 4 with prejudice; dismissed Count 5 without prejudice; and preserved Count 1, the *Mount Laurel* builder's remedy claim.[20]   The State Court conducted a four-day bench trial on Count 1 in June 2011 and entered a written opinion on October

---

[19] Conlon Decl., June 12, 2007 Decision and Order on Debtors' Order to Show Cause (Hurley, J.), Ex. B, Dkt. No. 337-1.  The Defendants named in the caption of this Decision and Order are: (i) Borough of Milltown; (ii) Mayor and Counsel of the Borough of Milltown; (iii) Planning Board of the Borough of Milltown; (iv) Boraie Development, LLC; (v) Milltown Ford Avenue Redevelopment Agency; (vi) County of Middlesex; (vii) Board of Chosen Freeholders of the County of Middlesex.

[20] Conlon Decl., June 12, 2007 Decision and Order, at 31, 37-38, Ex. B, Dkt. No. 337-1.  The "builder's remedy" appears to be an equitable relief granted a developer in *Mount Laurel* Litigation. *Toll Bros., Inc. v. Twp. of W. Windsor*, 173 N.J. 502, 559 (2002).

12, 2011.[21]  A January 18, 2012 Order for Municipal Compliance, in most relevant part, fixed the project at "at least 350 residential units [lower than the 562 units which Mr. Berger sought in the original Complaint], of which at least 70 will be designated as low and moderate income units . . ." and fixed a deadline for Milltown and Boraie to submit an Amended Redevelopment Agreement.[22]

The January 18, 2012 Order also found Debtors "not entitled to a site-specific builder's remedy, but . . . entitled to the remedies set forth" in the State Court's October 12, 2011 Opinion.[23] Milltown and Boraie entered a February 14, 2013 Amended Redevelopment Agreement ("ARA") to develop not more than 350 units (even though the State Court's Order clearly set this number as a minimum).[24]

At this time, the Debtors had just filed their voluntary Chapter 11 petitions on February 11, 2013.  The *Mount Laurel* Litigation continued during the course of these bankruptcy cases and included one or more appeals in State Court.[25]  Debtors, on one side, and Borough of Milltown and Ford Avenue Redevelopment Agency, on the other, entered an April 20, 2014 Stipulation and Consent Order in the Bankruptcy Court to allow the latter two to undertake "eminent domain/condemnation proceedings" in the State Court  (the "Condemnation Litigation").[26]  The Condemnation Litigation did not commence until November 22, 2019 and is apparently ongoing.[27]

---

[21] This update is recited in the State Court's Jan. 18, 2012 Order for Municipal Compliance, at 2, Conlon Decl., Ex. C, Dkt. No. 337-1.

[22] Conlon Decl., Jan. 18, 2012 Order ¶ 5b, Ex. C, Dkt. No. 337-1; Conlon Decl., June 12, 2007 Decision and Order, at 24 (as to Mr. Berger's seeking 562 units), Dkt. No. 337-1.

[23] Conlon Decl., Jan. 18, 2012 Order ¶ 4, Ex. C, Dkt. No. 337-1.

[24] Boraie Obj. ¶ 10 (which also says: "will not exceed 350 units"), Dkt. No. 337; Conlon Decl., Feb. 14, 2013 Am. Redevelopment Agreement, at 6 § 1.1, Ex. A, Dkt. No. 337-1.

[25] Fourth Modified DS, Art. II.E.4, at 11-13, Dkt No. 483; and Ex. D-5.

[26] Apr. 20, 2014 Consent Order ¶ 2, Dkt. No. 117.

[27] Dec. 6, 2019 Declaration of Mark B. Conlon, Esq., in support of Boraie's motion to reopen record, Verified Complaint in Condemnation filed Nov. 22, 2019 by The Milltown-Ford Avenue Redevelopment Agency, Dkt. No. MID-L-007979-19, Ex. E, Dkt. No. 720-1; Dec. 13, 2019 Order granting in part and denying in part Boraie's motion to reopen record ¶ 2, Dkt. No. 723.

The *Mount Laurel* Litigation, the Condemnation Litigation and all related proceedings are collectively referred to as the "State Court Litigation."

(2) <u>The Environmental Protection Agency Litigation</u>

The claims of the EPA against the Debtors have had a significant impact on these cases, including the Debtors' ability to confirm the Plan. A summary of the EPA's relationship with the Debtor is set forth in the November 6, 2017 letter of U.S. Attorney Andrew Keir, Esq. in support of the Debtor's Fourth Modified Disclosure Statement and Plan.[28]

In 2004, the EPA responded to a report of contamination at the property of Debtor Alsol (site of the former Michelin tire facility).[29] EPA issued a September 2005 Administrative Order to Debtor Alsol under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") to remediate the Property.[30] Alsol did some work, but according to the EPA, did not comply with the Administrative Order, and EPA decided in December 2008 to undertake the work itself.[31] The EPA commenced an action against Debtor Alsol to gain access to the site (*United States v. Alsol Corp.*, Dkt. No. 2:09-cv-03026 (D.N.J.) ("Alsol I"). The District Court granted EPA access to the site on July 24, 2009, and EPA completed its work on January 22, 2010.[32] While on the premises, the EPA noted and completed asbestos remediation at another Debtor property on November 12, 2010.[33] The cost to EPA of both projects was $3,230,464.79.[34]

On July 26, 2011, the District Court in Alsol I granted the EPA a Consent Decree for $200,000 in civil penalties for Debtors' refusal to provide access to the Property.[35] On February

---

[28] Andrew Keir Letter, Nov. 6, 2017, Dkt. No 436, ("EPA Letter").
[29] EPA Letter, at 2.
[30] EPA Letter, at 2.
[31] EPA Letter, at 2.
[32] EPA Letter, at 2.
[33] EPA Letter, at 2.
[34] EPA Letter, at 2.
[35] EPA Letter, at 2. The July 26, 2011 Consent Decree was directed to Alsol, S B Building, and affiliated non-Debtors.

11, 2013, before those Debtors were scheduled to begin installment payments on the Consent

Decree, the Debtors filed the instant bankruptcy petitions.[36]   The EPA sued the non-Debtor

defendants in Alsol I for payment and was granted a May 9, 2014 judgment for enforcement in the

amount of $896,751.79 (for interest and stipulated penalties), which the Third Circuit affirmed on

August 7, 2015.[37]

      Shortly prepetition, in January 2013, the EPA sued Debtors Alsol, S B Building, and other

non-Debtor affiliates a second time in order to recover its remediation expenses from Alsol I

(*United States v. Alsol Corp.*, Dkt. No. 2:13-cv-00380 (D.N.J.) ("Alsol II").[38]   Discovery was

pending in Alsol II when the Debtors and EPA entered a Consent Decree to resolve Alsol II and

incorporated that Consent Decree into the May 15, 2017  Global Settlement that is in turn

incorporated into the Fourth Modified Disclosure Statement and Plan, which are the subject of this

confirmation.[39]   In time, the EPA filed three somewhat overlapping proofs of claim (based in part

on an alter ego theory) against the Debtors with the following components:

| In re S B Building, Case No. 13-12682 | | |
|---|---|---|
| Claim No. 13-1 | $  209,299.38 | civil penalties and interest Alsol I (unsec.) |
| | $3,230,464.79 | remediation expense that is the subject of Alsol II (secured per 42 U.S.C. § 9607(l)) |
| | | |
| In re SB Milltown, Case No. 13-12685 | | |
| Claim No 8-2 | $  314,752.00 | civil penalties and interest Alsol I (sec.) |
| | | |
| In re Alsol, Case No. 13-12689 | | |
| Claim No. 8-2 | $  209,299.38 | civil penalties and interest Alsol I (unsec.) |
| | $3,230,464.79 | remediation expense that is the subject of Alsol II (secured per 42 U.S.C. § 9607(l))[40] |

---

[36] EPA Letter, at 2.
[37] EPA Letter, at 2.
[38] EPA Letter, at 2-3.
[39] EPA Letter, at 3.
[40] EPA Letter, at 3.

The EPA also initiated an adversary proceeding in this case against Milltown and certain tax lien holders, including Sass, to determine the lien priority between and among EPA, Milltown and these tax lien holders (the "EPA Lien Priority Litigation"). Debtor Alsol intervened in this action.[41] Alsol I, Alsol II (via the Consent Decree), the EPA's claims (fixed by settlement at $2.45 million, as described below) and the EPA's Lien Priority Litigation (collectively, the "EPA Litigation") were all resolved, subject to this Court's approval, by the May 15, 2017 Global Settlement that is described below and is incorporated into the Fourth Modified Plan, for which the Debtor seeks confirmation.[42]

(3) The Cherry Tree/Sass Muni Litigation

Four tax lien holders, (i) Sass Muni IV, LLC; (ii) Sass Muni V, LLC; (iii) Sass Muni VI, LLC; and (iv) Cherry Tree Property, LLC (collectively, "Sass"), have functioned as a unitary creditor and party-in-interest in these cases. Beginning in 1996, the three Sass entities purchased a number of tax liens against Debtors' Properties.[43] Over time, Sass Muni IV and Sass Muni V assigned these liens to Cherry Tree.[44] In 2011 and 2012, Sass filed foreclosure actions in Superior Court of New Jersey, Chancery Division, Middlesex County.[45] Although some certificates were redeemed, a number were outstanding on the February 11, 2013 petition date.[46] On June 27, 2014, Sass moved for stay relief in the Bankruptcy Court on the grounds:

(i)     that Debtors owed Sass $5,091,657.24 under the tax certificates, including interest and penalties as of the petition date;

(ii)    that Debtors failed to pay an additional $900,189.74 in prepetition taxes; and $354,107.12 in post-petition taxes;

---

[41] Compl. filed Sept. 3, 2015, Dkt. No. 1; Feb. 23, 2016 Consent Order, Dkt. No. 16.
[42] EPA Letter, at 4, Dkt. No. 436.
[43] Sass's Motion for Stay Relief (uncertified statement; motion "verified" by Kirk Allison, manager of each of the tax claimants) ¶ 5, June 27, 2014, Dkt. No. 123 ("Sass Appl.").
[44] Sass Appl. ¶ 5.
[45] Sass Appl. ¶ 7.
[46] Sass Appl. ¶ 6.

(iii)    that Debtors owed the EPA $3,585,834.95 as a secured claim;

(iv)    that the Property was valued at $8.3 million in the May 30, 2013 Appraisal commissioned by Sass;[47] and

(v)    that Mr. Berger testified in an April 23, 2014 deposition conducted by Sass in a tax foreclosure proceeding that he made a deliberate decision not to pay taxes, opining that "borrowing . . . money from the municipality and the tax lien holder" in this manner "is a perfectly legitimate way to finance real estate."[48]

Mr. Berger's testimony during the confirmation hearing as to the Debtors' decision not to pay real estate taxes as a financing vehicle was to the same effect.[49]  Sass's stay relief motion (to which the Debtors and the EPA objected) was repeatedly adjourned based on the parties' settlement discussions and was ultimately resolved by the settlements on which the subject Fourth Modified Plan of Reorganization depends.[50]

On June 24, 2014 (three days before Sass filed the above stay relief motion), the Debtors filed a two-count Adversary Complaint against Sass (the "Sass Litigation"), primarily under N.J.S.A. § 54:5-63.1 (alleging "[e]xcessive charges or fees charged by tax sale certificate holder on redemption; forfeiture"), charging Sass with "bid rigging" (participating with others to manipulate tax certificate sales in order to inflate interest and penalties).[51]  As a remedy, Debtors sought to compel Sass to forfeit the tax certificates and to reduce or disallow Sass's proofs of claim.[52]  On Sass's motion to dismiss, the Court allowed the Debtors to file an Amended Complaint (adding counts for anti-trust, RICO and consumer fraud).[53]  Sass answered the Amended Complaint on February 2, 2015.[54]

---

[47] Patrick B. Ard Decl., May 30, 2013 Appraisal, Ex. A, Dkt. No. 123-13.
[48] Sass Appl. ¶¶ 21-27, 28; Apr. 23, 2014 Dep. Tr. 65:24-66:1, Ex. F, Dkt. No. 123.
[49] Mr. Berger testified on direct examination on the first day of trial: "As I think I've testified before in this Court, USLR has always used non-payment of real estate taxes as a way to finance real estate," Trial Tr. vol. 1, 91:18-20.
[50] Debtor Obj., Dkt. No. 150; EPA Obj., Dkt. No. 131.
[51] Compl., Dkt. No. 1, Adv. Pro. No. 14-1582.
[52] Compl., Dkt. No. 1, Adv. Pro. No. 14-1582.
[53] Am. Compl., Dkt. No. 12; Answer to Am. Compl., Dkt. No. 13, Adv. Pro. No. 14-1582.
[54] Am. Compl., Dkt. No. 12; Answer to Am. Compl., Dkt. No. 13, Adv. Pro. No. 14-1582.

At that point, on March 6, 2015, the United States, on behalf of the EPA, moved to intervene in the Sass Litigation in order to stay discovery and to preserve its right to file an Adversary Complaint to challenge the proofs of claim filed by Sass.[55]   The EPA was then prosecuting a criminal bid-rigging case, *United States v. Wolfson*, Dkt. No. 2:13-cr-00748-FSH (D.N.J. Nov. 19, 2013) and wanted the *Wolfson* case to finish first, in part so not "to improperly broaden the discovery available to criminal Defendants."[56]   While the EPA motion for intervention was pending, Sass filed an April 20, 2015 motion for summary judgment to dismiss the Amended Complaint.[57]   The parties (Sass, Debtors, EPA) entered a July 6, 2015 Consent Order allowing intervention and granting related relief.[58]   Debtors cross-moved for summary judgment on July 30, 2015; Sass replied; and EPA moved for leave to file an *amicus* brief.[59]   Those motions were repeatedly adjourned based on the parties' settlement discussions and were ultimately resolved by the settlements on which the subject Fourth Modified Plan of Reorganization depends.

(4)   The EPA Lien Priority Litigation

On September 3, 2015, pursuant to the July 6, 2015 Consent Order referenced above, the EPA filed an Adversary Complaint against Sass and the Borough of Milltown to establish the priority of its lien on Debtors' Properties as among Sass, Milltown and  EPA.[60]   EPA asserted that it had worked to clean hazardous waste from the Property of Debtor Alsol (the site of the former Michelin tire facility) beginning at least by January 2004 and that a lien for cleanup costs in favor

---

[55] EPA Br., at 2, Dkt. No. 14-1, Adv. Pro. No. 14-1582.
[56] EPA Br., at 2, Dkt, No. 14-1, Adv. Pro. No. 14-1582.  Though Defendant Wolfson was not directly involved with the Debtors' Properties, EPA opined that the Wolfson trial "is likely to elucidate relevant facts respecting the alleged bid-rigging conduct" and that defendants and witnesses in the *Wolfson* matter may have knowledge.  *Id*. at 3-4.
[57] Sass Motion for Summary Judgment, Dkt. No. 18, Adv. Pro. No. 14-1582.
[58] July 6, 2015 Consent Order, Dkt. No. 20, Adv. Pro. No. 14-1582.  This Consent Order, which also set the deadline by which EPA was to sue Sass, was renewed by Consent Orders entered on Jan. 22, 2016, Dkt. No. 33; Mar. 4, 2016, Dkt. No. 36, Adv. Pro. No. 14-1582.
[59] Sass Cross-motion, Dkt. No. 24; Debtors Reply, Dkt. No. 26; EPA *Amicus*, Dkt. No. 22, Adv. Pro. No. 14-1582.
[60] Compl., Dkt. No. 1, Adv. Pro. No. 15-2149.

of EPA affixed to the Property on November 5, 2004, when EPA first sent a notice of liability to

Alsol under 42 U.S.C. § 9607(1)(2).[61] The EPA asserted that it docketed its lien with the Clerk of

Middlesex County, New Jersey, on March 29, 2007.[62]   The EPA's cleanup activity continued

through 2010.[63]   The EPA Complaint laid out a meticulous chronology for the accrual of the Sass

and Milltown liens, both before and after the November 5, 2004 date on which EPA asserts its lien

affixed to the Property.[64]   As of the February 11, 2013 petition date, Debtors' liability to EPA had

grown to $3,021,951.50 (plus $137,002.25 in prejudgment, prepetition interest).[65]   The EPA then

filed Claim No. 13-1 on August 9, 2013 for $3,585,835 and Amended Claim No. 13-2 on

December 1, 2014 for $3,439,764.[66]

These parties entered a February 23, 2016 Consent Order allowing Debtor Alsol to

intervene in the EPA action against Sass and Milltown.[67]   Defendant Sass filed a motion for partial

summary judgment on May 11, 2016, limited to a declaration that its liens had priority over those

of EPA (without liquidating the value of Sass's liens).[68]   The motion was fully briefed and was

also repeatedly adjourned based on the parties' settlement discussions and was also resolved by

the settlements on which the subject Fourth Modified Plan of Reorganization depends.

(5)  The Bankruptcy Case (and On-Going Litigation)

The Debtors filed their instant, voluntary Chapter 11 petitions on February 11, 2013.   The

Court entered an Order for joint administration on June 5, 2013.[69]   In their first motion to extend

---

[61] Compl. ¶¶ 10, 15, Dkt. No. 1, Adv. Pro. No. 15-2149.
[62] Compl. ¶ 16, Dkt. No. 1, Adv Pro. No. 15-2149.
[63] Compl. ¶ 10, Dkt. No. 1, Adv. Pro. No. 15-2149.
[64] Compl. ¶¶ 17-43, Dkt. No. 1, Adv. Pro. No. 15-2149.
[65] Compl. ¶ 11, Dkt. No. 1, Adv. Pro. No. 15-2149.
[66] Claim Nos. 13-1 and 13-2.
[67] Feb. 23, 2016 Consent Order, Dkt. No. 16, Adv. Pro. No. 15-2149.  The Court also granted the motion of the New
Jersey State League of Municipalities and the Tax Collectors & Treasurers' Association of New Jersey to appear as
*amicus*, May 20, 2016 Order, Dkt. No 23, Adv. Pro. No. 15-2149.
[68] Sass's Motion for Summary Judgment, May 11, 2016, Dkt. No. 22, Adv. Pro. No. 15-2149.
[69] Order for Joint Administration, June 5, 2013, Dkt. No. 24.

exclusivity, Debtors asserted that the Properties had an aggregate market value "in excess of $12,000,000."[70]  An August 23, 2013 Order required the Debtors to file a Disclosure Statement and Plan by October 31, 2013.[71]  The Court also entered a September 10, 2013 Order on Debtors' motion extending exclusivity to October 31, 2013 without prejudice to further extensions.[72]  On October 31, 2013, the Debtors filed their original Disclosure Statement and Plan.[73]

In that Disclosure Statement, the Debtors opined that the aggregate market value of the Debtors' Milltown Property was $20 million (without accounting for the value of assets owned by 388 Route 22).[74]  The original Disclosure Statement generally proposed to pay both secured and unsecured claims in quarterly payments over five years with a twenty-five-year amortization schedule and a balloon payment at earlier of (i) the closing of sale of the Properties; or (ii) the end of the five-year period, with monthly payments paid by the Debtors' affiliate, USLR, to the extent rents were insufficient to cover them.[75]  The Debtors did not indicate how they would make the balloon payment if it did not sell the properties.  The Debtors intended to object to the claims of Sass, EPA and IRS.[76]  The original Disclosure Statement drew objections from Sass and from EPA.[77]

The Debtors filed a First Modified Disclosure Statement and Plan on January 10, 2014.[78]  Here, Debtors stated that Boraie had offered Debtor $7.5 million for the Debtors' Properties one-and-one-half years earlier, but that Debtors believed that the Properties' value "exceeds $20MM"

---

[70] Motion to Extend Exclusivity ¶ 8, Dkt. No. 22-1.
[71] Aug. 23, 2013 Order, Dkt. No. 45 (it is not clear what motion, if any, generated this Order).
[72] Sept. 10, 2013 Order, Dkt. No. 47.
[73] DS and Plan filed Oct. 31, 2013, Dkt. Nos. 62 and 61 (the three Debtors, here and afterwards, were consolidated into one DS and Plan with classes still distinguished on a per-debtor basis).
[74] DS, Art. II.F.1, at 11, Dkt. No. 62.
[75] DS, Art. III, at 16-39, Dkt. No. 62.
[76] DS, Art. III.E.4, at 32, Dkt No. 62.
[77] Sass Obj., Dec. 3, 2013, Dkt. No. 71; EPA Obj., Dec. 4, 2013, Dkt. No. 72.
[78] First Modified DS, Dkt. No. 78; First Modified Plan, Dkt. No. 77.

and opined that a condemnation proceeding anticipated by the Debtors would take two years to complete.[79]  The Debtors proposed largely the same treatment of claims as previously (quarterly payments over five years, twenty-five-year amortization, balloon payment paid by sale of the Properties) with the addition of a loan from USLR as necessary to meet Debtors' obligations.[80] Debtors still planned to object to the claims of Sass, EPA and IRS.[81]  The First Modified Disclosure Statement drew objections from Sass and the EPA.[82]  At the hearing on February 6, 2014, the Court required further modification in short order (by February 28, 2014) and declared that the Court did not expect to conduct another hearing on Disclosure Statement.[83]

The Debtors did not send the Court a Draft Second Modified Disclosure Statement until September 5, 2014 and requested a further hearing on the Disclosure Statement.[84]  The Debtors proposed largely the same treatment of claims as previously (quarterly payments over five years, twenty-five-year amortization, balloon payment paid by sale of the property) with the addition of an unsecured loan from USLR as necessary to meet Debtors' obligations and an escrow from USLR for the Debtors' first year of Plan obligations plus real estate taxes.[85]  Debtors still planned to object to the claims of Sass, EPA and IRS.[86]  The Second Modified Disclosure Statement drew an objection from Sass only.[87]  A docket entry for March 9, 2015 indicates that a hearing on the Second Modified Disclosure Statement was held on that date and a further amendment required.

---

[79] First Modified DS, Art. II.F.2, at 11, Dkt. No. 78.
[80] First Modified DS, Art. III.C, at 19-31; Loan at Art. III.D.1, at 31, Dkt. No. 78.
[81] First Modified DS, Art. III.E.4, at 33, Dkt. No. 78.
[82] Sass Obj., Dkt. No. 89; EPA Obj., Dkt. No. 88.
[83] Feb. 6, 2014 Hr'g Tr., 27:3-29:12, especially 28:6-23, Dkt. No. 97.  Chief Judge Kaplan presided over these cases until mid-2015, when they were reassigned to this Court.
[84] Sept. 5, 2014 Letter, at 1-3; Draft Second Modified DS and Plan, Dkt. No. 133.
[85] Second Modified DS, Art. III.C, at 24-38; Loan at Art. III.D.1, at 38, Dkt. No. 149.
[86] Second Modified DS, Art. III.E.4, at 40, Dkt. No. 149.
[87] Sass Obj., Mar. 2, 2015, Dkt. No. 163.

On May 7, 2015, in much the same format as it had with the prior version, Debtors submitted a Draft Third Modified Disclosure Statement and Plan to the Court under cover of a letter dated May 7, 2015.[88]  The Debtors again proposed quarterly payments over five years, twenty-five-year amortization, balloon payment paid by sale of the property.  The Debtors reiterated their position that the Property was worth at least $20 million (subject to increase if Debtors were authorized to build additional units).[89]

The Court held a hearing on the adequacy of the Third Modified Disclosure Statement on June 23, 2015.[90]  Debtors' Counsel and the U.S. Attorney for EPA both averred at the June 23, 2015 hearing that the distribution to general unsecured creditors of Debtor Alsol under the Draft Third Modified Disclosure Statement and Plan was 20%.[91]  Debtors' Counsel averred that general unsecured creditors of S B Building and of SB Milltown would be paid 100%.[92]  At the end of the colloquy, Debtors' Counsel acknowledged that the Debtors had assented to the changes requested by the EPA, but the Court left to Debtors' discretion whether to put this Plan out to a vote.[93]  Debtors later characterized the result of this conference as the parties (Sass, EPA, Debtors) having "agreed to suspend the confirmation process so that the parties could attempt to address the various disputes among the parties."[94]  Mr. Berger certified that, on November 12, 2015, the Bankruptcy Court suspended proceedings and ordered the parties to mediation.[95]

---

[88] May 7, 2015 Letter and Draft Third Modified DS and Plan, Ex. 1, Dkt. No. 175.
[89] May 7, 2015 Letter and Draft Third Modified DS, Art. II.E.6 and II.F.1, Ex. 1, Dkt. No. 175.
[90] June 23, 2015 Hr'g Tr., Dkt. No. 196.
[91] June 23, 2015 Hr'g Tr. 30:22-24; 40:8-16, Dkt. No. 196.
[92] June 23, 2015 Hr'g Tr. 39:23-40:7, Dkt. No. 196.
[93] June 23, 2015 Hr'g Tr. 44:18-46:5, Dkt. No. 196.
[94] Lawrence S. Berger Certification in Support Motion Approving Settlement with Sass ¶ 26, Aug. 25, 2016, Dkt. No. 259-1 ("Berger Certif.").
[95] Berger Certif. ¶ 27, Dkt. No. 259-1.

The Honorable Stephen Orlofsky, U.S.D.J. (Ret.) mediated in January 2016 and in April

2016 and returned a settlement between and among the Debtors and Sass only.[96]  Judge Orlofsky

kept mediation open, according to Mr. Berger, because Judge Orlofsky deemed that resolution of

an issue in the EPA lien priority litigation could facilitate complete resolution of the mediation.[97]

(6)  The UST's Motions to Convert or Dismiss

The UST filed a December 29, 2015 motion to convert or dismiss because the Debtors'

monthly operating reports and quarterly fees were delinquent for April 2015 through November

2015 (eight months).[98]  Debtors filed all these delinquent monthly operating reports on January 12,

2016 (and the UST withdrew his motion on February 11, 2016).[99]  On January 28, 2016, the UST

filed a motion to compel USLR to respond to a Rule 2004 Subpoena through which the UST sought

discovery about USLR's financial wherewithal.[100]  The Court entered a March 16, 2016 Order

compelling compliance by USLR.[101]

On August 25, 2016, the Debtors filed a motion to approve a "limited" global settlement

among Sass, Debtors and Debtors' two affiliated entities, 199 Realty Corp. (debtor in Case No.

13-14776 (VFP)) and 190 South Street Realty LLC (debtor in Case No. 15-14558 (VFP)), (the

"Sass Settlement Motion").[102]  For the Debtors, the Settlement reduced Debtor's liability to Sass

from $6.6 million to $5.5 million; had no interest accrual for 2.25 years from the date of entry of

the Settlement Agreement (entered on May 31, 2016);[103] provided interest thereafter at 12% (not

---

[96] Berger Certif. ¶ 27, Dkt. No. 259-1.
[97] Berger Certif. ¶ 27, Dkt. No. 259-1.
[98] UST Motion, Dkt. No. 210.
[99] MORs, Dkt. Nos. 215-222; Notice of Withdrawal of Motion to Dismiss, Dkt. No. 234.
[100] UST Motion, Dkt. No. 229.
[101] Letter Obj., Feb. 16, 2016, Dkt. No. 235; Mar. 16, 2016 Order, Dkt. No. 241.  Debtor's Counsel claimed on behalf of USLR in an April 11, 2016 letter that its responses were complete but declared that the UST disagreed (Dkt. No. 244).
[102] Sass Settlement Motion, Dkt. No. 259.
[103] Berger Certif., May 31, 2016 Term Sheet (signed), Ex. A, Dkt. No. 259-1.

18%) on principal only; allowed cash payments to start on the 28th month; caused liens to be retained and cross-collateralized and cross-defaulted to all three Debtor Properties.[104]   The claims were to be paid in full on the earlier of (i) receipt of condemnation proceeds; or (ii) six years from the date of parties' entry into a Consent Order incorporating the terms of this settlement.[105]   The terms of the Consent Order were to be "incorporated in any and all plans of reorganization or liquidation, with all payments thereunder to continue under such plans."[106]   This motion drew objections from the EPA on multiple substantive grounds.[107]    The Sass Settlement Motion was repeatedly adjourned at the parties' request.

On February 13, 2017, the UST moved to appoint a Chapter 11 Trustee or to convert the case to one under Chapter 7  for failure to file Monthly Operating Reports; for failure to pay UST fees for five months; for accrual of unpaid post-petition taxes; for unauthorized transfers; and for diversion of funds.[108]   The UST also opposed the Sass Settlement Motion on February 24, 2017 and asked the Court not to decide the Sass Settlement Motion until the Court had decided whether to leave Mr. Berger in control of the Debtors.[109]   Debtors and Milltown entered a May 10, 2017 Consent Order for the payment of certain post-petition taxes.[110]

(7)  The Global Settlement and Plan Confirmation Proceedings

On May 10, 2017, the EPA filed a Notice of Lodging of Settlement Agreement, an administrative requirement that preceded the Debtors' next submission.[111]   On May 15, 2017, the Debtors filed a Motion to Approve Settlement between and among:  (i) Debtors; (ii) Sass; (iii)

---

[104] Berger Certif. ¶ 54, Dkt. No. 259-1.
[105] Berger Certif. ¶ 54 and Term Sheet (signed), Ex. A, Dkt. No. 259-1.
[106] Berger Certif., Term Sheet (signed), at 7, Ex. A, Dkt No. 259-1.
[107] EPA Br., Dkt. No. 275.
[108] Kropiewnicki Certif., Dkt. No. 299-1.
[109] UST Obj., Dkt. No. 302.  The Sass Settlement Motion was superseded by the Global Settlement Motion and was ultimately withdrawn on Nov. 6, 2017 (Notice of withdrawal of Sass Settlement Motion, Dkt. No. 435).
[110] May 10, 2017 Consent Order, Dkt. No. 381.
[111] Notice of Lodging of Settlement Agreement, May 10, 2017, Dkt. No. 319.

Borough of Milltown; (iv) EPA; (v) U.S. Coast Guard; (vi) non-debtor S B Building GP, LLC (the

50% owner of Debtor S B Building); (vii) United States Land Resources, Inc.; (viii) United States

Realty Resources, Inc.; and (ix) Lawrence S. Berger, Esq. (the "Global Settlement").[112]

The Global Settlement was a significant event as it resolved all claims and outstanding

litigation between and among these parties (including the priority dispute between Sass and the

EPA); required the substantive consolidation of the three Debtors and cross-collateralization of the

Sass and EPA claims); provided for remedies upon default (and allowed the EPA to proceed

against other Defendants in a coverage dispute); and required these terms to be included with the

next (fourth) Disclosure Statement and Plan of Reorganization to be filed by the Debtors.[113]  The

Global Settlement required that its terms be incorporated into any future Plan, addressed other

Plan-related provisions and provided that it would become effective when the Confirmation Order

became non-appealable (the "Effective Date").[114]  The Global Settlement would become null and

void if a Chapter 11 Trustee were appointed before the Effective Date.[115]  The motion approving

the Global Settlement was first scheduled for a hearing on June 27, 2017.

At this point, Boraie filed its first submission since docketing its Notice of Appearance on

March 11, 2014.[116]  On June 20, 2017, Boraie filed an objection to the Motion approving the Global

Settlement, replaced on September 6, 2017 with an amended objection.[117]  Boraie argued at length

that the Global Settlement motion lacked adequate facts to allow the Court to determine whether

the Settlement was fair and equitable to non-settling creditors; did not explain how the Sass

---

[112] Motion Approving Settlement, May 15, 2017, Dkt. No. 322.  The Debtor simultaneously filed objection to the UST's motion to appoint a Chapter 11 Trustee or to convert the case to one under Chapter 7, Dkt. No. 323.
[113] Notice of Lodging of Settlement Agreement, Settlement Agreement, Ex. A, Dkt. No. 319.
[114] Berger Certif., Global Settlement ¶¶ 4, 5, 6, 7, 10, Ex. B, Dkt. No. 322.
[115] Berger Certif. Global Settlement ¶ 9, Ex. B, Dkt. No. 322.
[116] Notice of Appearance, Mar. 11, 2014, Dkt. No. 103.
[117] Boraie Obj., June 20, 2017, Dkt. No. 337; Boraie Obj., Sept. 6, 2017, Dkt. No. 385.

settlement figure was reached; and did not disclose how viable were Debtors' tax appeals.[118]

Boraie also objected to the cross-collateralization provisions in favor of Sass and EPA; to Debtors'

$20 million valuation of the Property; and to the proposed substantive consolidation, which Boraie

argued benefited secured creditors and did not meet the criteria for substantive consolidation under

*In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).[119]   On September 8, 2017, after the

Debtors objected informally to Boraie's standing, Boraie acquired two claims that Archer &

Greiner, P.C. had filed against two of these Debtors on April 17, 2013:  Claim No. 1-1 filed against

S B Building for $63,479.14; and Claim No. 1-1 filed against Alsol for $44,851.82.[120]

After a June 27, 2017 hearing, the Court entered an Order on the UST's motion and, in lieu

of conversion or dismissal, directed the Office of the UST to appoint an examiner.[121]   The UST

appointed Frank E. Pina ("Mr. Pina") as examiner on June 29, 2017, and the Court entered an

Order confirming his appointment on July 6, 2017.[122]   As noted, Mr. Pina ultimately retained

counsel and retained his own firm, Mercadien, P.C., as accountants.[123]

The Court scheduled further proceedings and submissions on the contested Global

Settlement Motion to follow the examiner's production of a report.[124]   The examiner produced a

preliminary report on September 27, 2017.[125]   The UST renewed his motion to convert or to appoint

a Chapter 11 Trustee based on standard deficiencies (monthly operating reports and UST fees); on

the findings in the examiner's preliminary report (incomplete accounting, improper transfers and

---

[118] Boraie Obj. ¶¶ 34-45, Dkt. No. 385.
[119] Boraie Obj. ¶¶ 46-66, Dkt. No. 385.
[120] Apr. 17, 2013 Claim No. 1-1 and Notice of Transfer at Claims Register Entry 387; Apr. 17, 2013 Claim No. 1-1 and Notice of Transfer at Claims Register Entry 113.
[121] June 27, 2017 Order Directing the Appointment of an Examiner, Dkt. No. 338.
[122] Notice of Appointment, June 29, 2019, Dkt. No. 341; July 6, 2017 Order approving appointment, Dkt. No. 347.
[123] Order for retention of Trenk, DiPasquale, Della Fera & Sodono, P.C., as counsel, Dkt. No. 374; Order for retention of Mercadien, P.C., as accountant, Dkt. No. 369.
[124] Sept. 25, 2017 Scheduling Letter, Dkt. Nos. 398, 399.
[125] Examiner's Report, Sept. 29, 2017, Dkt. No. 400.

deposits); on Debtors' alleged obstruction of the examiner's work; and on anomalies that the UST's auditor discovered in Debtors' monthly operating reports.[126]

While the Global Settlement Motion and the UST's Motion were pending, the Debtors filed a "new" Third Modified Disclosure Statement and Plan on October 26, 2017.[127] The EPA filed a November 6, 2017 letter announcing that it had received no public comments to the Global Settlement based on its public notice; that it would not "exercise its right to withdraw"; and that the Global Settlement was "proper under applicable environmental law and should ultimately be approved."[128] The Third Modified Disclosure Statement did indeed incorporate, both actually and by reference, the Global Settlement (Art. II.E.12, pp. 20-21 and Global Settlement, Ex. 3), as well as (i) a term sheet (undated) signed by the Debtors and by Borough of Milltown; and (ii) a Consent Order, signed by the Debtors and by Sass, not dated or entered by the Court, in order to facilitate those aspects of the Global Settlement.[129]

The examiner filed his final report on December 29, 2017.[130] Debtors filed a lengthy rebuttal; the UST supplemented his motion to convert or to appoint a Chapter 11 Trustee on the basis of the examiner's final report; and Boraie renewed its opposition to the Global Settlement as well as supporting the UST's motion.[131]

The hearing to approve the October 26, 2017 Third Modified Disclosure Statement (which included the Global Settlement) was originally scheduled for November 28, 2017 but was repeatedly carried until the Debtors filed the Fourth Modified Disclosure Statement and Plan on

---

[126] UST Br. ¶¶ 13-27, Dkt. No. 417-2; Kropiewnicki Certif., ¶¶ 7-21, Dkt. No. 417-1.
[127] Third Modified DS and Plan, Oct. 26, 2017, Dkt. Nos. 428, 427. The Debtor presumably labeled this DS and Plan Third Modified because it had never put to a vote the May 7, 2015 Third Modified DS and Plan (which had preceded the settlement negotiations).
[128] Nov. 6, 2017 EPA Letter, at 1, Dkt. No. 436.
[129] Third Modified DS and Exs. 1 (term sheet); 2 (Consent Order); and 3 (Global Settlement), Dkt. No. 428.
[130] Examiner's Report, Dec. 29, 2017, Dkt No. 463.
[131] Debtor Rebuttal, Feb. 13, 2018, Dkt. No. 473; UST Supplement, Feb. 13, 2018, Dkt. No. 475; Boraie Obj., Feb. 13, 2018, Dkt. No. 474.

March 1, 2018 (still incorporating the Global Settlement and related agreements).  The Court approved the Fourth Modified Disclosure Statement by Order entered on March 5, 2018 and scheduled confirmation for April 26, 2018.[132] The UST's motion to convert or appoint a Chapter 11 Trustee was carried, pending the results of the confirmation hearing.

On April 23, 2018, the Debtors filed a Certification of Balloting that reflected overwhelming approval of the Plan by all creditors that voted.[133]  In each of the three Debtor cases, the Debtors easily satisfied the voting requirements of 11 U.S.C. § 1126(c) (acceptance by at least two-thirds in amount and one-half in number of each class entitled to vote) and § 1129(a)(10) (at least one impaired class must accept the Plan, without considering the votes of insiders).  Although there was some issue about certain creditor votes being double counted (primarily as the result of the identity of interests among the Debtors, see section 6, *infra*), there is no dispute that these voting requirements were satisfied no matter how the votes were counted.  In fact, as noted, the *only* creditor that voted to reject the Plan was Boraie in the S B Building and Alsol cases.

Only Boraie and the UST filed objections to confirmation, but they were extensive.[134]  The UST objected on the grounds of feasibility, given the numerous and substantial initial, installment and balloon payments due under the Plan; the parties' concerns about the accuracy of rent rolls and income projections; the ability and resolve of USLR to backstop Plan payments; the reliability of Debtors' $20 million valuation; and Mr. Berger's April 16, 2018 deposition testimony to the effect that the payment of the Debtors' obligations is discretionary.[135]

---

[132] Fourth Modified DS and Plan filed Mar. 1, 2018, Dkt. Nos. 483, 482; Mar. 5, 2018 Order approving Fourth Modified DS, Dkt. No. 484.
[133] Certification of Balloting, Apr. 23, 2018, Dkt. No. 501.
[134] Boraie Objs., May 3, 2018, Dkt. Nos. 506, 507; UST Obj., Dkt. No. 508.
[135] UST Obj. ¶ 14, Dkt. No. 508.

In preparation for the confirmation hearing, Boraie stipulated with Debtor the conditions under which the parties would agree to admit the June 13, 2017 appraisal of the Properties commissioned by Boraie from Rosin Associates ($7.65 million);[136] submitted witness and exhibit lists;[137] and moved on shortened time to compel Debtors and USLR to respond to discovery.[138] Boraie objected to confirmation on feasibility and numerous additional grounds, including failure to provide for administrative expense payment; lack of good faith; "improper" consolidation and cross-collateralization; inability to meet cramdown provisions of 11 U.S.C. § 1129(b) based on the cross-collateralization and consolidation provisions; violations of the absolute priority rule and unfair treatment of creditors.[139]

The confirmation hearing began on April 26, 2018 on what would become the first of ten days of trial.[140]  The UST and Debtors entered a May 22, 2018 Stipulation and Consent Order that required Mr. Berger's various debtors-in-possession to retain certified public accountants and postponed the hearing on the UST's motion to May 16, 2018, a date expected to be after the Court determined whether to confirm the Fourth Modified Plan.[141]  The only witnesses called at the confirmation hearing were Mr. Berger, who was subject to extensive direct and cross-examination, and Boraie's financial expert, William Pederson of EisnerAmper LLP.

## V.    LEGAL ANALYSIS AND CONCLUSIONS

The Court will address the various objections of Boraie and the UST in the order outlined in the Introduction to this Opinion.

---

[136] May 3, 2018 Stipulation as to Rosin Associates, Dkt. No. 502.
[137] Witness List, May 3, 2017, Dkt. No. 509; Ex. List, May 3, 2017, Dkt. No. 510; Am. Ex. List, May 15, 2018, Dkt. No. 517.
[138] Boraie Discovery Motion, May 15, 2018, Dkt. No. 511.
[139] Boraie Obj., Dkt. No. 506.
[140] Trial Tr. vol. 1.
[141] May 22, 2018 Stipulation and Consent Order, Dkt. No. 528.

### 1. The Alleged Inability to Pay Administrative Claims in Accordance with the Plan and Bankruptcy Code

Boraie and the UST argue that the Debtors do not have the ability to satisfy the requirement of 11 U.S.C. § 1129(a)(9) that all administrative claims be paid in full on the Effective Date, unless the affected parties agree to a different treatment. More specifically, Boraie notes that the Debtors' cashflow projections fail to provide for funding of substantial administrative expense claims that accrued during these cases, including more than $700,000 in professional fees, over $65,000 in post-petition accounts payable and UST fees in excess of $27,000. Boraie and the UST also argue that this inability also demonstrates that the Debtors' Plan is not feasible. The Court is addressing this argument first because if this fundamental requirement of section 1129(a)(9) is not satisfied, the Plan cannot be confirmed.

The Debtors' response is essentially that they will either pay the administrative expense claims in full on the Effective Date or as otherwise agreed by the parties, thereby satisfying 11 U.S.C. § 1129(a)(9). The question that Boraie and the UST rightfully raise is how. At the confirmation hearing, Mr. Berger testified that the other properties controlled by USLR regularly generate proceeds from rental income, sales and/or refinancings that could be used to pay the administrative expenses. While Boraie and the UST criticize these statements and projections as speculative and unsupportable, the Court can and will take judicial notice of at least one such sale that occurred in late December 2019, shortly after the conclusion of testimony and briefing in this case. That sale took place in *In re Fin Associates Limited Partnership* (Case No. 19-28386), (the "*Fin Associates* Case") that was also before this Court.

In that case, the debtor, another USLR/Berger-controlled entity, sold its property for $17.8

million and simultaneously paid off first mortgage indebtedness of $12.6 million.[142] The sale also

resulted in payment in full of all other claims, including 100% of the undisputed claims of

unsecured creditors, with interest.[143]  After those payments, more than $3.5 million of net equity

remained for Fin Associates and its owner.[144]  From those proceeds, $1.1 million was placed in

escrow with the Debtors' counsel for the payment of administrative claims in *these* cases pursuant

to an Order of this Court.   See Dismissal Order [Dkt. No 83, Case No. 19-28386, at 4-5], which

provides as follows:

> ORDERED that Rabinowitz, Lubetkin & Tully, LLC  [these Debtors'
> counsel] shall continue to hold $1,100,000 in its attorney account from
> the proceeds of Debtor's [Fin Associates'] sale to pay allowed
> administrative claims of professionals in the S B Building Associates LP
> (13-12682), SB Milltown Industrial Realty Holdings, LLC (13-12685)
> and Alsol Corp. (13-12689) cases. . . .

With this reserve, the Debtors have the ability to pay allowed professional administrative expense

claims in full on the Effective Date (or as otherwise may be agreed by the affected parties).  This

includes the $400,000 combined administrative claims of Trenk, DiPasquale, Della Fera &

Sodono; McManimon, Scotland & Bauman; Frank A. Pina, Esq.; and Mercadien, P.C., CPAs,

which were the subject of a standing objection to plan confirmation and includes fees incurred in

these and other cases involving certain other entities affiliated with these Debtors, 190 South Street

---

[142] The Court notes that in connection with the sale hearing in the *Fin Associates* case, another bid of $18.5 million was made, but was determined not to be the highest and best offer by the Debtor and ultimately this Court because it required a delayed closing.   Time was of the essence and the Debtor, who was assured of receiving equity, testified (through Mr. Berger) that it preferred the lower offer of $17.8 million because of its certainty and timing.  The Court notes the $17.8 sale price and $18.5 million offer were reasonably close to Mr. Berger's $19 million estimate of its value on D-9 in evidence.
[143] See Order Authorizing Sale of Debtor's Real Property pursuant to 11 U.S.C. § 363, and Other Related Relief (the "Sale Order") in the *Fin Associates* case, Dkt. No 58; and Order Dismissing Debtor's Chapter 11 Proceeding and Other Related Relief (the "Dismissal Order") in that case, Dkt. No. 83.
[144] Berger Certif. in Support of Sale Mot., ¶¶ 15-16, Dkt. No. 34-1, (*Fin Associates* case, Dkt. No. 19-28386).

Realty Holdings, L.P.; 199 Realty Corp.; and 3920 Park Avenue Associates, L.P.[145]  The other

administrative expenses, including payables of $65,000 and UST fees of $27,000, may also be

paid from any remaining escrowed funds and/or from other debtor or USLR sources.  Thus, the

Debtors have the ability to satisfy the requirements of 11 U.S.C. § 1129(a)(9)(A) regarding the

payment of administrative expenses.  For the same reasons, the arguments that the Debtors' Plan

is not feasible because the Debtors are unable to provide for the required treatment of

administrative claims is rejected.

### 2.   The Plan Satisfies Feasibility Requirements of 11 U.S.C. § 1129(a)(11)

Section 1129(a)(11) of the Bankruptcy Code requires a debtor to demonstrate, by a

preponderance of the evidence, that "confirmation of a plan is not likely to be followed by the

liquidation, or the need for further financial reorganization of the debtor. . ." 11 U.S.C.

§ 1129(a)(11).    In other words, the Debtors "must demonstrate that the plan is feasible." *In re*

*TCI 2 Holdings LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010).  The feasibility requirement does

not mean the debtor must provide a guarantee of success. *In re Greate Bay Hotel & Casino, Inc.,*

251 B.R. 213, 226 (Bankr. D.N.J. 2000).  "The purpose of 1129(a)(11) 'is to prevent visionary

schemes that promise creditors and equity security holders more under a proposed plan than the

debtor could possibly attain after confirmation.'" *In re Sound Radio, Inc.,* 103 B.R. 521, 522

(D.N.J. 1989) *aff'd without opinion*, 908 F.2d 964 (3d Cir. 1990); *In re Congoleum Corp.,* 362

B.R. 198, 203 (Bankr. D.N.J. 2007) (same). *In re Eddington Thread Mfg. Co., Inc.,* 181 B.R. 826,

832 (Bankr. E.D. Pa. 1995) (same).

In determining whether the feasibility standard is met, a court must be satisfied that the

plan is workable and has a reasonable likelihood of success. *In re Leslie Fay Co. Inc.,* 207 B.R.

---

[145] June 18, 2019 Trenk Obj. covering Dec. 18, 2018 Consent Order from affiliated cases, Dkt. No. 642.

764, 788 (Bankr. S.D.N.Y. 1997); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762

(Bankr. S.D.N.Y. 1992).  As noted, no guarantee of success is required and the "mere potential for

failure of the plan is insufficient to disprove feasibility."  *In re TCI 2 Holdings, LLC,* 428 B.R. at

148 (internal quotation omitted).  The "key element of feasibility is whether there is a reasonable

probability the provisions of the plan can be performed."  *In re G-I Holdings, Inc.,* 420 B.R. 216,

267 (D.N.J. 2009).  A "relatively low threshold of proof" may satisfy the feasibility requirement.

*See In re TCI 2 Holdings, LLC*, 428 B.R. at 148.

> In considering these various factors, at least one court emphasized that:

> > The first, best indicator of feasibility is the position of the creditors whose
> > economic interests are at stake.  The support or opposition of creditors
> > with *skin in the game* and an opportunity to study a debtor's proposal is
> > more illuminating to the Court than any expert report or accountant's
> > projections.

*In re Indianapolis Downs, Inc.,* 486 B.R. 286, 298 (Bank. D. Del. 2013) (emphasis supplied).  This

Court agrees wholeheartedly.

> Here, the creditors with "skin in the game" voted overwhelmingly in favor of the Debtors'

Plan and/or entered into settlements with the Debtors that plainly indicated their support for the

Plan.  The *only* creditor that objected and voted against the Plan  (as to Alsol and S B Building)

was Boraie, whose primary interest in this case was not to maximize its recovery on the $108,000

in claims it purchased (during the course of these cases and only *after* the Debtors objected to its

standing), but rather to defeat the Debtors' Plan so that Boraie can pay as little as possible for the

Properties – leading inevitably to the result that unsecured creditors will receive nothing.  Thus,

discounting Boraie's patently conflicting interest and vote, this primary factor -- the near

unanimous support of creditors with respect to the Plan -- weighs heavily in favor of a finding of

feasibility.  Put simply, and as emphasized by the *Indianapolis Downs* court, there is no better

evidence of feasibility than the fact that creditors who have "skin in the game" and have been

dealing with Mr. Berger and his affiliated entities over many years (if not decades), are willing to

support the Debtors' Plan.    Boraie's interests lie in a wholly different game -- obtaining the

Debtors' Properties for the lowest possible price -- that is directly contrary to the interests of the

voting and nonvoting creditors who overwhelmingly supported the Plan.

After considering this primary factor, additional factors that the courts have considered are:

(i) the adequacy of the debtor's corporate structure; (ii) the earning power of its business; (iii)

economic conditions; (iv) the ability of debtor's management; (v) the probability of continuation

of the same management; and (vi) any other related matters which determine the prospects of a

sufficiently successful operation to enable performance of the provisions of the plan.    *In re Greate*

*Bay Hotel & Casino, Inc.,* 251 B.R. at 226-27 (citing cases).

As to these other factors, the objections focused on the earning power of the Debtors' and

USLR's businesses and Mr. Berger's fitness to serve as manager of these Debtors.    Here, the Court

acknowledges the evidential deficiencies in the Debtors' case as to the availability of funds from

the RMA Agency Account (the "Agency Account"),[146] which did not include the expense side of

the ledger and which Mr. Berger testified was not owned by USLR (though it is controlled by him

through USLR).    In fact, other than identifying RMA as the account holder, Mr. Berger could not

identify who owned the funds in the Agency Account.    Also troublesome was Mr. Berger's

testimony that all expenses are discretionary.    This somewhat flippant testimony is reflective of

Mr. Berger's way of doing business.    Expenses may be discretionary in a general sense, as a party

can choose to pay or not to pay them.    There are, however, consequences associated with the failure

to pay, which Mr. Berger acknowledges.

---

[146] Ex. D-5.

The question for this Court in determining feasibility is whether Mr. Berger will use that discretion to pay or, more accurately, cause the Debtors and USLR to pay the initial, periodic and balloon payments required under the Debtors' Plan.  The Court's answer is that it is more likely than not that he will, or he risks losing the substantial equity that he firmly believes the Debtors have in their Properties – perceived equity that he has been fighting to preserve for well over a decade in litigation with Milltown, Boraie, the EPA and others.  Thus, as Mr. Berger testified, his plan is to use that discretion to make those payments.  And if he does not, Sass and the EPA negotiated default provisions that allow them to pursue all state court remedies if the defaults are not cured in thirty days.  Similar default provisions are available to other secured creditors under the Plan.  Additionally, the Plan provides that a creditor may move to convert or dismiss these cases if the Debtors' default in performance of the Plan or other cause exists for conversion or dismissal under 11 U.S.C. § 1112(b).[147]

To further provide incentives for Mr. Berger and his affiliates to make the payments required under the Plan to unsecured creditors as well, and to provide effective remedies to *all* creditors if they do not, the Court will incorporate into its confirmation order a similar thirty-day default provision for the benefit of  those unsecured creditors, i.e., upon a default that is not cured within thirty days of receipt of a Notice of Default by the Debtors, the affected unsecured creditors will have their claims accelerated and will also have the right to exercise their state law remedies and move to convert or dismiss these cases.

Next, the Court will analyze the Debtors' ability to make the initial, periodic and balloon payments due under the Plan.

---

[147] Fourth Modified Plan, Art. IV.D, at 25, Dkt. No. 482.

(1) Initial Payments

As to the financial ability of the Debtors to perform under the Plan, the Court first notes that $1.1 million is currently being held in escrow by Debtors' counsel to fund (as necessary) the administrative expense claims required to be paid on the Effective Date of the Plan (unless otherwise agreed by the claim holder).  As more fully described in this Court's prior discussion of the Debtor's satisfaction of the § 1129(a)(9) requirement to pay administrative and priority claims, this amount, combined with any additional finding required from the Debtor or USLR, is sufficient to fund the approximately $700,000 to $1.2 million in estimated administrative claims.[148]  Thus, the Court finds that the Debtors have the ability to fund the initial payments due under the Plan.

(2) Periodic Plan Payments

As to the installment payments due under the Plan, the evidence showed that the Debtors generate rental income of approximately $195,000 per quarter (or $65,000 per month), against Plan expenses of $178,419 per quarter ($80,000 to Milltown, $77,000 to Sass, $25,000 to unsecured creditors, $20,500 to the EPA and $919 to the other tax lien certificate holders).[149]  The Debtors' other quarterly expenses total $100,475.[150]  According to the Debtors, this leaves a shortfall of approximately $108,894 per quarter or $36,333 per month,[151] which is to be funded by USLR's backstop guarantee.  That guarantee was modified to eliminate the $40,000 per month and $1.2 million overall limitations on USLR's funding obligations; however, the backstop does not apply to the balloon payments.[152]  Thus, USLR's backstop, no longer limited to $40,000 per month and $1.2 million in total funding, is at least theoretically sufficient to cover any shortfall in

---

[148] See section 1, above.
[149] See Ex. G, projections attached to Fourth Modified DS (in evidence as D-5), Trial Tr. vol. 3, 35-46.
[150] *Id.*, Ex. G.
[151] If the Debtors' figures (and the Court's math are correct), the shortfall is actually less -- $83,894 per quarter (or $27,694.67 per month): $195,000 - $178,419 plan expenses - $100,475 other expenses = ($83,894).
[152] See Ex. D-8; Trial Tr. vol. 3, 55:3-56:11.

cash flow from the Debtors to fund the installment Plan payments.  However, Boraie and the UST rightfully raise the questions as to whether: (i) USLR has (or controls) sufficient financial resources to make the periodic backstop payments; and (ii) the Debtors have a realistic ability to pay the substantial balloon payments due under the Plan (which USLR has not backstopped). Though close calls, this Court finds that under the applicable feasibility standards described above (which are even lesser in the case of balloon payments), the Debtors have satisfied their burden, as buttressed by the additional default provisions being required by the Court.

Much of the testimony and dispute relating to the Debtors' ability to make the installment payments required under the Plan (with USLR's backstop) revolved around the probative value (or lack thereof) of the information regarding deposits into the RMA Agency Account[153] which averaged $660,000 per month.[154]   Preliminarily, the Court agrees with Boraie and the UST that the evidential value of this information is limited since it does not include expenses, as was forcefully and convincingly argued by Boraie through its expert and the UST.  In fact, Boraie's expert opined that the Agency Account was of no value in determining whether USLR could meet its backstop obligations principally because it did not include the expense side of the ledger and the negative balances that existed at times.[155]

While the Court acknowledges that this evidence is of limited value, it does reflect that substantial amounts of this money go into and out of the Agency Account on a regular basis, with periodic ebbs and flows, including some negative numbers, as well as substantial increases from sales or refinances as they occur.   Boraie also pointed to the likely (now certain) loss of rental income from Debtors' subsidiary 388 Route 22 and argues that any payments received from 388

---

[153] Ex. D-5.
[154] Ex. D-5a.
[155] Trial Tr. vol. 10, 41:13-42:17.

Route 22 would be fraudulent transfers in any event.  As to that loss of income, the Debtors presented testimony that annual rental income from the Properties they directly own (excluding 388 Route 22) has increased to $750,000 (or $187,500 per quarter and just slightly less than the $195,000 reflected in the Plan) and that USLR would fund any deficiency with its backstop.[156] Thus, the loss of payments made by 388 Route 22 does not render the Debtors or USLR without sufficient other resources to fund Plan payments, nor would those payments necessarily be fraudulent, as is discussed in Section 7 of this Opinion.

Boraie and the UST also understandably argue that Mr. Berger's "all expenses are discretionary" statement (or theory) means that Mr. Berger can choose not to make the payments at any time, as has in fact happened in at least certain other cases involving Mr. Berger and USLR. Mr. Berger's testimony is that, in these cases, he will use that discretion to cause the payments to be made so as to preserve what he believes to be the substantial equity in the Properties (based on his own personal valuation of $20 million to $30 million).  While this Court is not finding that this is the value of the Debtors' Properties, it does find that Mr. Berger firmly believes they are worth that much and that they will generate proceeds sufficient to satisfy the secured and other claims to be paid pursuant to the Plan, as well as provide a return for equity.  The Court further finds that he and USLR will continue funding those payments, unless and until it is finally determined by a court of competent jurisdiction that the Properties are not worth enough to generate those anticipated returns.[157]  The Court, therefore, credits his testimony and the related evidence to the extent that it supports the Debtors' position that USLR has the ability and desire to make the

---

[156] See, e.g., Trial Tr. vol. 4, 22:5-15 (ability of USLR to sell properties it controls to fund the Plan); Ex. D-5a; Ex. D-9a (describing potential equity in USLR properties over more than $70 million (reduced from a $95 million estimate reflected in Ex. D-9); Trial Tr. vol. 4, 137:18-20 (backstop funding); Trial Tr. vol. 8, 87:13-17 (rent receipts and increased rent at S B Building Property).

[157] Trial Tr. vol. 3, 72:15-74:14 (USLR backstop payments on behalf of Debtors have a "very, very high priority of payment").

necessary "backstop" payments under the Plan so that this substantial perceived equity can be preserved.

As partial evidence of that commitment, Mr. Berger testified that, during the course of these cases, USLR paid $125,000 to the EPA on behalf of the Debtors to satisfy a judgment and $600,000 to pay for demolition of parts of the Properties.  As to the Agency Account, there is no question that substantial funds go into and are paid out of that account on a monthly basis.  Nor is there any dispute that USLR has other significant funding obligations under other plans (and otherwise).  There is similarly no dispute that the amounts going into the account are, on average, in excess of USLR's backstop obligations in these and other cases of approximately $100,000 per month.[158]  Thus, while there certainly is a legitimate question as to whether USLR will ultimately be able to meet its quarterly backstop obligations under the Plan, the Court finds that the Debtors' and Mr. Berger's efforts over the last fifteen or so years to preserve and enhance the value of the Debtors' Properties through the *Mount Laurel* and related litigations with Milltown and Boraie, bringing and funding other high stakes litigation against Sass, the EPA and others, and the financial and other commitments made to creditors and these Debtors in support of this Plan, including Mr. Berger's personal guarantee of the $2.45 million obligation to the EPA under the Global Settlement,  all combine to provide sufficient evidence that the Debtors, with USLR's backstop, have a reasonable probability of meeting their installment obligations under the Plan.

Mr. Berger further testified that USLR has the financial ability to fund (or cause to be funded) any deficiency in Plan payments, even if in excess of its backstop commitment.[159]  That

---

[158] See Ex. D-5a (Agency Account) and USLR Bankruptcy Funding Obligations, Ex. D to Disclosure Statement. These funding obligations may have changed (perhaps downward) as the result of post-Plan events, including the B&D and 388 Route 22 debtors' defaults under their plans.  Boraie argues that the failure to fund these shows USLR's inability and/or unwillingness to honor its commitments.  However, as is noted in this Opinion, USLR has honored its commitments in other cases.  The Court cannot predict with certainty future defaults in these or other cases, but it can and does find that USLR has the incentive and ability to meet the periodic payments due under the Plan in these cases.
[159] See n.156, *supra*.

funding could come from cash flow or the sale of other properties, as has occurred in various other bankruptcy cases before this Court. In certain cases, USLR funded plan payments for extended periods until a sale could be consummated. In other cases, the properties were sold pre-confirmation. Where they were sold, there were often sufficient proceeds to pay secured and unsecured creditors in full and significant equity left to the Debtors. See, for example, *In re Blair Realty Holdings LLC*, Case No. 11-37887 (MBK) (with mortgage of approximately $8 million, USLR provided backstop funding of approximately $100,000 per month for two years, until that vacant property was sold for approximately $12.5 million, with payment in full to all creditors and an unspecified return to equity); *In re Bank Building Associates, LP*, Case No. 14-35958 (VFP) (USLR provided backstop funding of over $120,000 until the property was sold and all creditors were paid in full); *In re B & D Associates, Ltd.*, Case No. 14-33428 (VFP) and *In re Sussex Randolph Building, L.P.*, Case No. 14-34505 (VFP) (USLR paid approximately $1 million to reinstate mortgage loans and continued to make payments to backstopped creditors for two years, although the debtor in B & D ultimately defaulted).[160]   *See also In re Fin Associates Limited Partnership*, Case No. 19-28386 (VFP) (property sold, creditors paid in full, and more than $3 million returned to equity); and *In re 190 South Street Realty Holdings, L.P.*, Case No. 15-14558 (VFP) (property sold, creditors paid in full with unspecified equity to return to owner).[161]

The Court recognizes that other property dispositions by USLR affiliated entities have not been successful. See, for example, *388 Route 22 Associates* (though its creditors are apparently being paid in full);[162] and the *Berley Associates*, *Washington Center Assocs.* and *Allentown Power Center* cases cited at 10-11 of Boraie's reply brief. However, the mere fact that the Plan may fail

---

[160] Trial Tr. vol. 4, 75:13-80:25.

[161] See also Ex. F to Fourth Modified DS, which includes the income statements for USLR for 2014 to 2016 and the proceeds from properties sold during those periods.

[162] Morris Bauer Certif., Dkt. No. 181-1, Case No 18-30155 (KCF).

"is insufficient to disprove feasibility." *See TCI 2 Holdings, LLC*, 428 B.R. at 148. Additionally, and as was noted above, the Court also presided over other USLR related cases that resulted in payment in full to all creditors and significant equity being returned to the affiliated debtors. In short, there are some cases that turn out well for the USLR affiliates and others that do not. The Court cannot predict with certainty what will happen here, but determines that it is more likely than not that Mr. Berger (through the Debtors and USLR) will come up with the necessary funds to make the Plan payments as they come due. If they do not, all creditors – including Boraie – will have the full panoply of state court and Bankruptcy Code remedies at their disposal under the Plan's default provisions, as supplemented by this Court, and the substantial perceived equity in the Properties that Mr. Berger has been fighting to preserve for more than a decade will be lost.

      (3)      <u>Balloon Payments</u>

The Plan also calls for substantial balloon payments generally beginning to come due in 2022 (and continuing through 2026, as to unsecured creditors) in the total amount of approximately $12 million.[163] These payments are to be funded upon the sale or condemnation of the Debtors' Properties, which would result in accelerated payments to creditors if the sale or condemnation occurs before the due date of the balloon payment. As noted, Mr. Berger believes that the sale or other disposition of the Debtors' Properties will not only be sufficient to pay creditors, but also result in a substantial return of equity to the Debtors. If he did not firmly believe that, Mr. Berger would have caused these Properties to be abandoned long ago. Mr. Berger also testified that the sale or refinance of other USLR properties could provide the necessary funding for the balloon payments.[164] Though the Court acknowledges there is again

---

[163] Trial Tr. vol. 4, 89:4-6.
[164] See generally, Ex. D-9a, which lists the USLR portfolio of properties, and previous discussion of successful sales of other USLR properties.

at least some uncertainty here, the case law also indicates that the Debtors do not need to demonstrate that there is a guarantee of financing or sale or other sources of funding to make those payments – just a reasonable likelihood that they will be made.  That burden is even lesser with regard to the balloon payments at issue in this case.  *See In re Eddington Thread*, 181 B.R. at 833; *In re Briscoe Enterprises,* 994 F.2d 1160, 1169 (5th Cir.), *cert. denied*, 510 U.S. 992 (1993).  For the reasons stated, the Debtors have met their burden to show that reasonable likelihood exists here.

(4) Other Relevant Feasibility Factors

As to the management factor, Mr. Berger has been involved in the commercial real estate business for some fifty years, on both the business and legal sides.  His long experience in the industry and the tenacity with which he litigates and negotiates have often resulted in beneficial outcomes for Mr. Berger and his entities, as evidenced by the settlements with Sass, Milltown and the EPA in this case and in the other cases noted above.[165]  This factor weighs firmly in favor of a finding of feasibility.  As to the loss of rental income after the Property is condemned and the funds placed into Court, Mr. Berger testified – and it was not disputed – that these funds could be withdrawn by the Debtors to fund Plan obligations.[166]  He further testified that these funds, along with other sources noted above, could be utilized to make Plan Payments.[167]

While the Court is considering all these factors, as was noted at the outset, the most important and primary factor in determining feasibility is what the parties with "skin in the game" had to say.   Here, those parties evidenced their support for the Debtors' Plan by either voting overwhelmingly in its favor, entering into settlements that formed the basis for the Plan and/or

---

[165] See also section 4, *infra*.
[166] Trial Tr. vol. 1, 78:21-79:2; Trial Tr. vol. 2, 108:16-109:13; Trial Tr. vol. 8, 74:5-18; 75:1-11.
[167] *Id.* See also n.156.

otherwise supporting (or not objecting to) confirmation of the Plan.  If there was not this overwhelming support, the very real feasibility and related concerns raised by Boraie and the UST would carry more weight.  However, like the court in *Indianapolis Downs*, this Court finds that the near unanimous creditor support present here is the best evidence of a Plan's feasibility and outweighs the objections of Boraie and the UST.  The Court accordingly finds that the Debtors have met the feasibility requirements of section 1129(a)(11).

### 3.  <u>The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law</u>

Section 1129(a)(3) of the Code requires as a condition to confirmation that a plan be proposed in good faith and not be in any means forbidden by law.  *In re Noll*, 172 B.R. 122, 124 (Bankr. M.D. Fla. 1994).  The good faith determination is made by evaluating the totality of the circumstances surrounding confirmation and requires that the Plan be "proposed with honesty, good intention and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code."  *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988) *aff'd in part*, *remanded in part*, 103 B.R. 521 (D.N.J. 1989) *aff'd* 908 F.2d 964 (3d Cir. 1990); *In re Madison Hotel Assocs.*, 749 F.2d 410, 424 (7th Cir. 1984); *see also In re Seasons Partners, LLC*, 439 B.R. 505, 512-13 (Bankr. D. Ariz. 2010).

In this connection, it is indisputable that a "primary goal of Chapter 11 is to promote the restructuring of the debtor's obligations so as to preserve the business and avoid liquidation."  *In re Leslie Fay,* 207 B.R. at 781.  A plan that includes the consensual resolution of disputes between the debtor and its creditors, and that proposes to pay creditors in full "clearly promotes the objectives and purposes of the Bankruptcy Code."  *In re Couture Hotel Corp.,* 536 B.R. 712, 735 (Bankr. N.D. Tex. 2015).  Therefore, good faith is shown when a "plan that has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate, and

delivering that value to creditors." *In re Genco Shipping & Trading Ltd.,* 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014).

The Debtors' Plan as proposed is completely consistent with the purposes of the Bankruptcy Code.  The Debtors' primary secured obligations are being reduced and restructured pursuant to the Global Settlement so that a substantial dividend to unsecured creditors is possible. As was previously noted, those unsecured creditors would undoubtedly receive nothing if the Debtors were liquidated according to the $7.65 million and $1.75 million valuations promoted by Boraie.  Those valuations are dwarfed by total secured claims of approximately $16.5-$17.5 million before the Settlements and approximately $12.5 million after.[168]

Tellingly, these lower valuation amounts are what Boraie argues are the true value of the Debtors' Properties and what Boraie proposes to pay for them in the state court condemnation proceedings.  Thus, Boraie is plainly better off in its capacity as Redeveloper if the Debtors are liquidated.  Just as plainly, Boraie is far worse off in its capacity as an unsecured creditor if the Debtors are liquidated.  In this Court's view, that inconsistency amply demonstrates that Boraie's motivations for objecting in this case are based on its role as Redeveloper and its understandable desire to pay as little as possible for the Properties it seeks to redevelop.  However, those interests are directly contrary and materially adverse to the interests of the Debtors' other creditors, secured

---

[168] Boraie's argument that SB Milltown's creditors would be adversely affected by the Plan because they would receive a 75% dividend in liquidation is rejected by this Court for several reasons.  First, as was testified to by Mr. Berger, and as was reflected in the appraisals submitted by Boraie, there is no proper or accurate way to assign values to the separate parcels owned by the individual Debtors, as the Properties have not yet been developed and there is no way to know where units may be built or how sale or condemnation proceeds would be allocated.  Trial Tr. vol. 2, 78:15-79:2 (as to Sass); 109:14-110:7 (as to EPA).  Further, as Mr. Berger also testified, even if there was some way to separately consider each Debtor property, the unsecured creditors would also get nothing in a liquidation based on the secured claims against each entity.  Trial Tr. vol. 2, 184:21-186:5; 187:20-189:6.  Finally, and also tellingly, Boraie is again arguing against its interests as unsecured creditor of Alsol and S B Building but *not* SB Milltown.  In fact, it has no standing to make this argument on behalf of SB Milltown's creditors, as it is not one of those creditors.  By making this argument, Boraie essentially acknowledges that it would receive nothing from the liquidation of Alsol and S B Building and resorts to arguing against its interests (as an unsecured creditor of Alsol and S B Building) and on behalf of creditors of SB Milltown, as to which it has no claim.

and unsecured alike, as even secured creditors would not be paid in full if the Debtors were liquidated and values promoted by Boraie are utilized.

The objectives of the Bankruptcy Code are further advanced by the three settlements with secured creditors that were achieved only after years of litigation, many months of negotiations between and among the parties and with the assistance of at least two mediators. The Plan was accepted by all classes that voted and was not objected to by any creditor other than Boraie. This overwhelming creditor approval came after creditor votes were solicited with a Disclosure Statement that included an extensive listing of virtually all of Boraie's objections, as drafted by Boraie's counsel, including as to the Debtors' asserted lack of good faith and the Debtors' inability to consummate their Plan.[169]

Additionally, the Plan provides for payments to unsecured creditors that will begin three months after confirmation and would have commenced much earlier, but for the protracted confirmation proceedings (through and including multiday hearings; extended mediation sessions in the midst of those hearings, pre- and post-hearing submissions and drafting of this Opinion). The Plan also provides for payment in full of those creditors, which is also obviously consistent with the objectives of the Bankruptcy Code.

Boraie's response to these arguments is essentially that the Debtors' Plan is not feasible (which is addressed elsewhere in this Opinion) and that the Debtors' Plan is somehow to the detriment of their unsecured creditors. That is simply incorrect, as this Court also previously found. The Debtors' Plan provides for payment in full for all creditors (some secured creditors at compromised amounts), as compared to a liquidation scenario where unsecured creditors would receive nothing and secureds would receive only partial payment of their claims.

---

[169] See Fourth Modified DS, Art. III.G, at 47-50, Dkt. No. 483.

As to the Debtors' and USLR's willingness and ability to make the necessary payments to fund the Plan, the Court has already recognized that Mr. Berger's testimony to the effect that all payments are discretionary is discomforting to all, including this Court, and certainly is being considered in this good faith analysis.  But, as Mr. Berger testified, and as this Court has seen in various cases involving Mr. Berger's affiliates, payments are made when USLR and its affiliated debtors are trying to save their properties and Mr. Berger believes the properties are worth saving.  Thus, without adopting Mr. Berger's testimony that the value of the Properties is $20-$30 million or more, the Court does find that Mr. Berger firmly believes they have substantial value in excess of the claims against the Debtors' Properties and will do what is necessary to preserve that value, which includes prosecution of this Plan, entering into the Global Settlement with the principal secured creditors, the continuation of long-standing litigation with Milltown and Boraie to achieve the highest value for the Properties and the commitment of USLR and its affiliates to fund Plan payments in the event of any deficiencies in the initial and installment payments.

Boraie also argues that the Debtors' lack of good faith and USLR's inability to fund the Plan are demonstrated by the more than $5 million in judgments against USLR and the fact that the Debtors did not disclose a wholly owned subsidiary during the course of this case, 57 Elm Street Holdings.  However, as noted, the existence of that subsidiary was ultimately discovered and disclosed and USLR has been operating for many years with the judgments against it.  These deficiencies are certainly not condoned by this Court, but they are not, in this Court's view, sufficient for it to make a determination that a Plan: (i) which proposes to pay creditors in full, with interest; (ii) was overwhelmingly accepted by every class that voted; and (iii) includes compromises that result in the resolution of hotly contested litigation and millions of dollars of

savings to the Debtors is proposed in bad faith.[170]  Nor is the Plan proposed by any means forbidden

by law, including as to the Plan's cross-collateralization and substantive consolidation provisions

and section 1129(b)'s fair and equitable requirements.[171]  To the contrary, the plan is consistent

with the Bankruptcy Code and its goals.  Accordingly, the objections to the Plan on these grounds

are overruled.

### 4.  Management of the Debtors by Mr. Berger Is Not Inconsistent with the Interests of Creditors or Public Policy

The UST and Boraie emphasize that "[o]paque reporting and resistance to following the

rules in bankruptcy have been the hallmarks of this case. . ." in arguing that Mr. Berger should

not be permitted to continue to manage these Debtors.[172]  In support, Boraie and the UST rely on

11 U.S.C. § 1129(a)(5) of the Bankruptcy Code, which requires disclosure of the identity,

affiliation and compensation of any individual proposed to serve as management of the Debtor

and section 1123(a)(7), which requires that a plan contain only "provisions that are consistent

with the interests of creditors and equity security holders and with public policy with respect to

the manner of selection of [any such manager]."  *See In re Basha's Inc.,* 437 B.R. 874, 912 (Bankr.

D. Ariz. 2010).

The Court acknowledges that "opaque reporting" and "resistance to following the rules"

have occurred in this case.  In fact, these issues were among the primary reasons the Court

determined to appoint an Examiner.  Despite these deficiencies, which have been fully aired at

various points in this case, including in the Examiner's Reports, the objections to confirmation

by Boraie and the UST and the UST's motion for conversion to Chapter 7 or the appointment of

---

[170] The Court has also determined that the cross-collateralization and substantive consolidation provisions of the Plan are permissible and therefore not forbidden by law.
[171] See sections 5, 6, and 8, *infra.*
[172] UST Reply Br. ¶ 34, Dkt. No. 705.

a Chapter 11 Trustee, creditors voted overwhelmingly to approve the Plan which continues Mr. Berger (and RMA) at the helm of these Debtors. Thus, the Court must decide whether the undeniable deficiencies in the Debtors' financial reporting and rule compliance, which have been ameliorated to an extent by the Debtors' retention of a CPA and other corrective measures,[173] outweigh the similarly undeniable will and vote of the Debtors' creditors. Although admittedly another close and difficult call, the Court finds that the deficiencies are not sufficient to override the will of creditors. The Court will therefore overrule these objections.

Although the parties disagree as to whether Mr. Berger and RMA should continue as managers under the applicable standards of sections 1123(a)(5) and 1129(a)(7), they do not disagree as to the principles underlying those standards, as described in the case law. In considering whether the post-confirmation management of the Debtors is consistent with the interests of creditors, equity security holders and public policy, a Court is required to evaluate the proposed management's competence, discretion, experience and affiliation with entities having an interest adverse to the Debtor. *See In re W.E. Parks Lumber Co., Inc.,* 19 B.R. 285, 292 (Bankr. W.D. La. 1982). Continued service by prior management may be inconsistent with the interest of creditors and public policy "if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor." *In re Seasons Partners, LLC,* 439 B.R. 505, 513 (Bankr. D. Ariz. 2010) (citing cases with similar holdings).

Generally, however, "[t]he debtor should have first choice of its management, unless compelling cause to the contrary exists. . . ." *In re Sherwood Square Assoc.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989). Another guiding general principle is that, if the continuation of

---

[173] May 22, 2018 Stipulation and Consent Order requiring Debtors to retain CPA (and granting other relief), Dkt. No. 528.

management is supported by creditors, the plan is, by definition, not inconsistent with the interests

of those creditors.  *In re Leslie Fay,* 207 B.R. at 787.

Applying these factors here, the Court is persuaded that the choice of creditors, the Debtors,

and its equity security holders should carry the day, notwithstanding the acknowledged issues

with certain of the Debtors' – and Mr. Berger's – financial reporting practices and adherence to

the rules.  Based on more than four decades of experience in the real estate industry and as a

lawyer representing the interests of his affiliated real estate companies, Mr. Berger undeniably

has the necessary experience and competence to do what he has been doing for approximately the

last fifty years.  His experience and competence and the exercise of his judgment and discretion

for the benefit of the Debtors are plainly manifested in this case, where Mr. Berger was able to

achieve difficult and beneficial settlements with the EPA, Sass and Milltown, while at the same

time successfully (for the most part) prosecuting *Mount Laurel* and related litigation against

Boraie and others in the State Court for almost fifteen years.  There, the Debtors succeeded in

increasing the density permitted on the Debtors' Properties to at least 350 units, with 10,000

square feet of commercial space, and 20% of the units designated for low and moderate income

individuals.[174]   In the State Court, the Debtors also successfully challenged an infrastructure

agreement between Boraie and Milltown.  That effort resulted in savings of $1.5 million to the

Debtors.[175]

Mr. Berger also committed USLR to backstop the cash flow deficiencies in the Debtors'

operations and agreed to a personal guarantee of $2.45 million in connection with the settlement

with the EPA.  Thus, his (and USLR's) affiliations and interests are in no way adverse or inimical

to the Debtors; instead, they are completely and beneficially aligned.  Indeed, by that personal

---

[174] Fourth Modified DS, Art. II.E.4, at 11, Dkt. No. 483.
[175] *Id.* at 13.

guarantee, Mr. Berger has his own "skin in the game" and further incentive to see that the Plan succeeds. In these circumstances, the overwhelming will of creditors and the Debtors' existing equity holders is entitled to substantial weight, notwithstanding the Debtors' and Mr. Berger's undisputed lapses in this case.[176]

On the other hand, there is no doubt that the Debtors' and Mr. Berger's lapses are significant and include the failure to pay administrative claims, such as professional fees and real estate taxes, during the long course of these cases. However, as is noted above, the Debtors have committed to pay the professional claims on the Effective Date (or as otherwise agreed by those creditors) and now have a fund of at least $1.1 million to make those payments. As to the failure to pay real estate taxes, the parties directly affected -- Milltown and the tax lien holders -- have raised no objections. In fact, Sass and Milltown settled with the Debtors, with Sass having voted in favor of the Plan, which includes payment in full of its claims with interest and retention of its liens. The other affected tax lien certificate holders did not object to their treatment under the Plan, which also provides for payment in full, with interest and retention of their liens.

As to Mr. Berger's asserted ignorance as to a disbursing agent's duties, the Court acknowledges that this is also problematic (and not particularly credible).[177] However, this issue is not one that individually, or in conjunction with others, is sufficient to override the will of the Debtors' creditors and its owners. Further, Mr. Berger would be well advised to take his duties as disbursing agent seriously, in default of which adverse consequences will result.

Both Boraie and the UST also take issue with S B Building's payment of the expenses of the other two Debtors, SB Milltown and Alsol. However, as was made clear at the confirmation

---

[176] *See In re Leslie Fay, supra*, 207 B.R. at 787.

[177] That said, to the extent Mr. Berger is not familiar with those duties, he voluntarily took on this serious responsibility and is required to discharge this duty responsibly. If he is unsure of the nature and extent of these duties, he should utilize the assistance of counsel and accountants as appropriate.

hearing, this was the normal course of business for these Debtors (and is another factor in favor of substantive consolidation). The Debtors argue that 11 U.S.C. § 364(a) allows a debtor-in-possession to incur unsecured credit in the ordinary course of business, which may be allowed as an administrative expense. But that authority is not directly applicable as to the advances because section 364 allows a debtor to borrow money in specified circumstances. It does not provide for a debtor to lend money on an unsecured (or other) basis. This is, however, the way these Debtors did business pre- and post-petition, as a matter of fact and practicality. In other words, these intercompany loans and advances, were and remain the ordinary course of business of these Debtors' business for which court approval is not necessarily required. *See* 11 U.S.C. § 363.

To this point, the reality is that the Properties of these three Debtors were uniformly operated as a single unit and treated as such by creditors and other parties-in-interest, including (but by no means limited to) the Borough of Milltown and Boraie. Mr. Berger further testified that it is common practice for mid-sized real estate firms to manage their business and make payments from a single account with the payments being separately allocated to the appropriate entity.[178] The Court is satisfied that the Debtors' unitary manner of operating and the allocation of income and expenses among the various affiliated entities, including advances by the income-generating Debtor(s) to the non-income-generating Debtor(s), is and was their ordinary course of business. Creditors at least implicitly, if not explicitly, endorsed and approved these continuing practices by voting in favor of the Plan and treating the Debtors as a single entity. Additionally, neither Boraie nor the UST was able to show at the confirmation hearing that any of the Debtors' funds were used for improper purposes.[179]

---

[178] Trial Tr. vol. 8, 35:20-36:4. As is noted in section 6 of this Opinion, this identity of interests and operations and general disregard of corporate separateness also support the Debtors' substantive consolidation request.

[179] In its reply post-trial brief, the UST questioned $1.5 million in payments made by S B Building over the course of these cases that were disclosed but not specifically identified. However, there was no testimony taken in regard to

Finally, the unauthorized payment of the expenses incurred by Mr. Berger's law firm and the omission of 57 Elm Street Realty Holdings (a subsidiary) from the Debtors' schedules are also not appropriate, nor are these omissions condoned by the Court.  The failure to disclose 57 Elm Street was discovered as the result of the UST's and Examiner's diligence.  The existence of this subsidiary thus became known to all and was fully aired prior to and during the confirmation hearing.  Thus, this omission was discovered in sufficient time to be addressed by all parties, and it did not change the Plan or deprive the creditors of a source of recovery (nor did it affect creditors' approval of the Plan).  The Court similarly does not approve Mr. Berger's payment of a portion of the expenses allegedly incurred by his firm without Court authorization.  This latter lapse was also discovered and properly challenged by the UST on the basis of disclosures made by the Debtors, and Mr. Berger's request for retroactive approval was denied in total.  As a result, Mr. Berger was directed to return the payments his firm received to the Debtors and did so.[180] Thus, these failings were adequately addressed during the course of these cases.

In sum, notwithstanding the proven lapses by Mr. Berger and the Debtors noted above, those lapses are not, in this Court's view, sufficient to override the overwhelming will of creditors and the Debtors' owners – the parties most affected by Mr. Berger's management.  Accordingly, the objections of the UST and Boraie to Mr. Berger and RMA continuing to serve as management of the Debtors are overruled.

---

this issue.  Also, there is no cash collateral order restricting the use of the Debtors' funds.  Thus, the UST did not provide sufficient proofs for the Court to determine whether or to what extent these payments were improper.

[180] See Oct. 16, 2019 Order Denying Berger and Bornstein's Entire Compensation Application of $43,320.85 and ordering disgorgement of $27,445.29 received, Dkt. No. 691.

**5. The Bankruptcy Code Does Not Prohibit Cross-Collateralization, Nor Does It Violate the Absolute Priority Rule**

(i)    Cross-Collateralization is Not Prohibited by the Bankruptcy Code

Boraie also argues that cross-collateralization is not permitted by the Bankruptcy Code, citing a series of cases that address debtor-in-possession financing arrangements where post-petition lenders seek to improve their prepetition undersecured position by cross-collateralizing their prepetition claim with Debtors' property. *See, e.g., In re Saybrook Mfg., Co., Inc.,* 963 F.2d 1490, 1493 (11th Cir. 1992); *In re Ellingsen MacLean Oil Co., Inc.,* 834 F.2d 599, 601 (6th Cir. 1987); *In re Gallegos Rsch. Grp. Corp.,* 193 B.R. 577, 586 (Bankr. D. Colo. 1995).

As noted by the Debtors, other cases have, however, allowed cross-collateralization in the same post-filing, pre-confirmation context based on findings that the financing being cross-collateralized was necessary for the debtor to seek to reorganize and that without the financing, the debtor would be forced to liquidate and unsecured creditors would receive a greatly diminished recovery or no recovery at all. *See, e.g., In re Vanguard Diversified, Inc.,* 31 B.R. 364, 366-67 (Bankr. E.D.N.Y. 1983); *In re Borne Chem. Co.*, Inc., 9 B.R. 263, 269-70 (Bankr. D.N.J. 1981); *In re Roblin Ind., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985). Thus, while cross-collateralization may be discouraged in certain circumstances, it is "often used, and even courts that discourage it have approved its use." *See, e.g., In re Ellingsen MacLean Oil Co., Inc.,* 834 F. 2d at 602, citing cases.

Although these authorities are not directly on point here because we are at the plan confirmation stage, the cases that have allowed cross-collateralization apply by analogy here, where the cross-collateralization is a key provision of the Global Settlement that is the cornerstone of the Plan. As noted, the Global Settlement provides the Debtors with the opportunity to reorganize rather than liquidate, which would leave unsecured creditors with nothing. These

factors, along with the overwhelming support of the creditor body, weigh heavily in favor of approval of the cross-collateralization in the plan confirmation context. *See, e.g., In re Vanguard,* 51 B.R. at 366 (cross-collateralization permitted where, without it, business would not survive and is in best interests of creditor body as a whole). Further, as is noted in the next section, sections 1123(b)(3) and (a)(5) provide separate and sufficient independent authority for the cross-collateralization.

        (ii)      Section 1123(b)(3) Allows for Cross-Collateralization as Part of the Settlement of Claims Against the Debtor

This case is at the confirmation stage, and no application to approve preconfirmation financing under 11 U.S.C. § 364 is before the Court. Thus, none of the cases cited by the Debtors or Boraie as to the propriety of cross-collateralization under section 364 are directly applicable. In these cases, the Global Settlement, as incorporated into the Plan, provides for cross-collateralization (and substantive consolidation) as key components of the resolution of numerous multiparty, hotly contested litigations. That Global Settlement also avoids a liquidation that would result in no recovery at all to unsecured creditors. The Bankruptcy Code allows for -- and indeed encourages -- such settlements as part of the plan confirmation process. 11 U.S.C. § 1123(b)(3); *In re Couture Hotel,* 536 B.R. at 735 (consensual resolution of debtor-creditor disputes "clearly promotes the objectives and purposes of the Bankruptcy Code").

At this point, the distinction between post-petition financing under 11 U.S.C. § 364 and the cross-collateralization (and consolidation) provisions of the Global Settlement and Plan becomes significant as sections 1123(b)(3)(A) and 1123(a)(1)(B), which specify certain of the provisions a plan may contain, provide separate and independently sufficient authority to approve the cross-collateralization.

a.   Section 1123(b)(3)(A)

Section 1123(b)(3) of the Code, entitled "Contents of Plan," provides that a plan may:

> (3)      provide for–(A) the settlement or adjustment of any claim
> or interest belonging to the debtor or to the estate.

As was emphasized by the Debtors at the confirmation hearing, the extremely beneficial settlements with Sass, the EPA and Milltown would not have been possible without the cross-collateralization and substantive consolidation provisions.  As a result of these settlements, Sass agreed to reduce its claim by more than $2 million, and the EPA agreed to reduce its claim by about $3 million.   Both agreed to subordinate their claims to Milltown (which agreed to accept payment of taxes it was owed over time).  Sass and the EPA further agreed to the respective priorities of the secured claims between themselves, but required cross-collateralization of their secured claims as a necessary component of their settlements.  These settlements paved the way for the Plan which proposes to pay secured and unsecured creditors in full, with interest.  They are also expressly authorized by the plain language of section 1123(b)(3) and encouraged by the Bankruptcy Code.

Without the settlements, the Debtor would be liquidated.  With a liquidation value of no more than approximately $7-8 million according to all sides (without considering the costs of a liquidation sale), and as low as $1.75 million, unsecured creditors would receive nothing, as the secured claims of Milltown, Sass and the EPA would far exceed the liquidation value of the Debtors' Properties.  The only "winner" in the liquidation scenario would be Boraie, but exclusively in its capacity as Redeveloper, rather than as a creditor (where it would receive nothing on its claim).  In fact, Boraie's steadfast opposition to cross-collateralization and the related settlements is completely contrary to not only its interests as an unsecured creditor, but the interests of *all* other creditors in this case -- unsecured, priority, and secured.  The Court will accordingly

51

approve the cross-collateralization provisions of the Plan, which are incorporated into the Global

Settlement, as expressly authorized by section 1123(b)(3)(A), and as fair and equitable and in the

best interests of creditors and the estate.[181]

### b.   Section 1123(a)(5)(B)

Additional authorization for the cross-collateralization may be found in 11 U.S.C.

§ 1123(a), which provides in subsection (5)(B) that a plan shall:

> provide adequate means for the plan's implementation, such as - - (B) transfer of all or any part of property of the estate to one or more entities, whether organized before or after the confirmation of such plan.

Here, the Plan is providing for a "transfer"[182] of the Debtor's property through the

cross-collateralization granted to Sass and the EPA as a means to implement the Plan.  As noted,

without the cross-collateralization, there would be no settlements and no Plan to confirm.

Thus, the cross-collateralization provision is not only a necessary component of each

individual settlement and the Global Settlement, but is also expressly permitted by the plain

language of at least two specific Code provisions that apply in the context of plan confirmation.

Cross-collateralization is also wholly consistent with the core Bankruptcy Code policies favoring

settlements and reorganization.  Because the cross-collateralization provisions (like substantive

consolidation, which is discussed in the next section) are essential to the settlements that are the

basis for the Plan, and because the settlements and "transfers" of the Debtors' Properties are

expressly permitted and encouraged by the Code in the Plan context, Boraie's self-defeating (in its

capacity as a creditor) objections to cross-collateralization are overruled.

---

[181] See also section 9, *infra*.

[182] Section 101(54) broadly defines a transfer to include: "(A) the creation of lien"; and "(D) each mode . . . of disposing or parting with (i) property or an interest in property." Thus, the cross-collateralization provision falls squarely within the plain language of section 1123(a)(5), by creating a lien and transferring an interest in property.

(iii)     Section 1129(b)(2)(B)(i) is Also Satisfied

Boraie also argues that the cross-collateralization provisions of the Plan violate the absolute

priority rule and therefore are not permitted under the Bankruptcy Code.  As to the absolute priority

rule, section 1129(b)(2)(B)(i) provides that with respect to a class of unsecured claims,

> i.  The plan provides that each holder of a claim of such
> class receive or retain on account of such claim property
> of a value, as of the effective date of the plan, equal to
> the allowed amount of such claim.

11 U.S.C. § 1129(b)(2)(B)(i).  Said another way, the absolute priority rule may be violated if a

junior class of creditors or interests receives value before the prior class is paid in full.  *See*

*generally, In re Greate Bay,* 251 B.R. at 232.

Under the Debtors' Plan, however, unsecured creditors are entitled to receive payment of

their claims in full, with interest.  Those payments are to be made quarterly over six years, with a

balloon payment due at the end of year six, unless there is a prior disposition of the Properties by

sale or condemnation that allows for earlier payment in full of such claims, also with interest.[183]

Thus, the absolute priority rule is not violated because unsecured creditors are receiving "property

of a value, as of the effective date of the plan, equal to the allowed amount of such claim."[184]

For this additional reason, the cross-collateralization provisions of the Plan and Global

Settlement are not prohibited by the Bankruptcy Code or the Absolute Priority Rule.  Accordingly,

Boraie's objections in these regards are overruled.

---

[183] See Fourth Modified Plan, Art. II.D.3, at 18-19, Treatment of Classes A9, B6 and C8, Dkt No. 482.
[184] Secured creditors are not an issue because each of them is retaining their respective liens, and either settled with the Debtors or did not object to the Plan which provides for payment in full of their claims.  Thus, section 1129(b)(2)(A)(i)(I) is satisfied.  Additionally, since Boraie is not a secured creditor, it does not have standing to object to the treatment of secured creditors under section 1129(b).  *See G-I Holdings*, 420 B.R. at 255.

**6.    Substantive Consolidation is Permitted in the Circumstances of this Case, But Not Exclusively (and Temporarily) for Plan Confirmation Purposes**

(i)    The *Owens Corning* Standard for Substantive Consolidation is Satisfied

There is no dispute as to the appropriate standard to be utilized in determining whether substantive consolidation is appropriate in this Circuit (if there is no creditor consent).  Under the Third Circuit's test established in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2007), the party seeking substantive consolidation (here, the Debtors) must show either that "(i) prepetition [the debtors] disregarded separateness so significantly that their creditors relied on breakdown of entity borders and treated them as one legal entity; or (ii) post-petition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."[185]  The proponent has the burden of showing either rationale is applicable.  Opponents can defeat the first rationale once a *prima facie* showing is made that they actually relied on the separateness of the entities and will be adversely affected by substantive consolidation.[186]

Boraie argues that neither standard is met, while the Debtors assert both are satisfied.  In this case, the principal creditors and other parties-in-interest -- Sass, the EPA and Milltown and all creditors other than Boraie -- have all supported substantive consolidation directly or indirectly by voting in favor of the Plan, settling with the Debtors and/or not objecting to the Plan.   Indeed, Sass and the EPA required substantive consolidation (and cross-collateralization) as part of their settlements.  Only Boraie objects.[187]

Mr. Berger testified at the confirmation hearing that the Debtors themselves, vendors and other creditors -- with the exception of the law firm from whom Boraie brought its claims – dealt

---

[185] *Id.* at 211.

[186] *Id.* at 212.  No creditor or other interested party was called to testify that they relied on the separateness of the Debtor entities.

[187] Boraie is not a creditor of SB Milltown, whose general unsecured creditors voted in favor of the Plan.  Thus, Boraie has no standing to object to the substantive consolidation of SB Milltown.  See nn. 168 and 184, *supra*.

with all three entities interchangeably or as one.    For example, creditors routinely sent an invoice

to one entity even though they were performing work for all three.[188]  Further, payments came

from Realty Management Associates no matter which entity was invoiced.[189]  Mr. Berger testified

that he himself made no distinction between the Debtor entities in managing their day-to-day and

general affairs and that the Debtors' Properties were treated as a single project.[190]  In fact, as

pointed out by Boraie's expert (and as was acknowledged by the Debtors), the creditor list in each

case is virtually identical and the amount owed to each vendor was listed as being owed by each

Debtor entity, resulting in an asserted overcounting of the amount and number of creditors of each

entity.[191]  Further, since most of the remaining usable buildings are on the S B Building Property,[192]

most of the rent generated by the Debtors was from S B Building and was used to fund expenses

of Alsol and SB Milltown (albeit without Court approval as noted above).[193]     In this Court's

view, these facts all weigh strongly in favor of substantive consolidation, as the Debtors

themselves, their creditors and others almost uniformly treated them as one.

This unity of corporate identities and general disregard of separateness extended to the

Borough of Milltown and its Redevelopment Agreement with Boraie, which included the real

property owned by all three Debtor entities and contemplated the redevelopment of all the Debtor-

owned parcels.  Similarly and necessarily, the *Mount Laurel* and related litigation in State Court

included all three Debtor entities, who, of course, were represented by the same counsel.  The

---

[188] Trial Tr. vol. 2, 177:18-180:12; Trial Tr. vol. 9, 45:8-46:6.

[189] Trial Tr. vol. 2, 180:13-25.

[190] *Id.* at 180:120-181:9. The Court recognizes that Mr. Berger gave certain contrary testimony when being questioned by Boraie.  However, the Court does not accept this testimony as credible or consistent with the economic and practical realities cited above.  In other words, the Court believes and finds that the three Debtor entities were treated as one, by Mr. Berger and others, and does not find credible--or supported by the evidence--his limited testimony to the contrary.  With this limited exception, no contrary testimony was offered.

[191] Trial Tr. vol. 5, 31:22-34:15; 71:10-18; Trial Tr. vol. 10, 85:2-16.   Nonetheless, to the extent overcounting of votes and amounts may have occurred, creditor approval was still overwhelming as only Boraie voted to reject the Plan.

[192] Trial Tr. vol. 3, 16:20-22.

[193] See generally, Monthly Operating Reports.

valuations of the Properties (for $7.65 million and $1.75 million) that were advanced by Boraie also treat the three Debtor Properties as one, rather than valuing them separately.[194]  Further, as was explained in n.168, unscrambling the values of these Properties would be difficult, if not impossible, and would be detrimental to creditors who treated the Debtors as one in any event.[195] The same would be true as to any effort to unscramble the operations and finances of these closely related entities.

In sum, the separately owned Debtor Properties were effectively treated as one by all the Debtors, virtually all creditors and other interested parties alike, both pre- and post-filing.[196] Treating them separately would be unfair, unnecessary and in contradiction of the essentially uncontroverted facts and reality.   It would also harm rather than benefit creditors if not approved, as their recoveries would be either greatly diminished (as to the secureds) or eliminated (as to the unsecureds) and result in additional and unnecessary expense.

The Court also finds it significant that the EPA required substantive consolidation as part of its agreement to reduce its claim from $5.45 million to $2.45 million and accept a 28-month payment moratorium as well as payments over time.[197]  Sass similarly required substantive consolidation as part of its agreement to reduce its indebtedness from what is now more than $7.5 million to $5.5 million.  As noted, these settlements laid the groundwork for the Plan that proposes to pay creditors in full, with interest, and without which all unsecured creditors, including Boraie,

---

[194] Apr. 24, 2018 Stipulation as to admissibility of June 13, 2017 Appraisal Report of Rosin & Associates, Dkt. 502; Nov. 6, 2019 Declaration of Mark B. Conlon, Esq., in support of motion to reopen record, Aug. 15, 2019 Appraisal of Lasser Sussman Assocs. *LLC* (commissioned by Milltown-Ford Avenue Redevelopment Agency), Ex. B, Dkt. No. 699-1.

[195] See also section 9, *infra* (as to gerrymandering concerns of Sass and EPA).

[196] The fact that one law firm creditor, Archer & Greiner, P.C., happened to have treated two of the Debtors separately does not detract from the Court's overall determination that the Debtors' corporate separateness was effectively and necessarily disregarded by virtually all.

[197] The EPA also asserted alter ego liability against all the Debtors in their proofs of claim and District Court Complaint.  Trial Tr. vol. 2, 181:15-182:13.

would receive nothing.  Thus, rather than resulting in unfair treatment of a particular group of creditors, as was the case in *Owens Corning,* substantive consolidation in this case will treat all similarly situated creditors equally, fairly and in a manner consistent with the way they dealt with the Debtors and the Debtors dealt with them pre- and post-petition.  Accordingly, the Court finds that both prongs of the *Owens Corning* standard for substantive consolidation have been met.

(ii)    <u>"Deemed" Substantive Consolidation is Not Permissible</u>

The Court agrees with Boraie, however, when it argues that the "deemed" consolidation for bankruptcy purposes only proposed by the Debtors' Plan is not permissible under *Owens Corning*, 419 F.3d at 211-16.   In fact, the *Owens Corning* court found a "deemed" substantive consolidation to be a "flaw most fatal" in that case.[198]

This Court is bound by *Owens Corning* and will not order a "deemed" consolidation for bankruptcy purposes only, which the Court believes is an unauthorized procedural device designed to create temporary administrative convenience and unfair legal benefit for the Debtors.  Either the Debtors meet the standard for substantive consolidation, or they do not.  *See In re Winn-Dixie Stores, Inc.,* 356 B.R. 239, 252, n.15 (Bankr. M.D. Fla. 2006); *see also Owens Corning*, 419 F.3d at 202.   If they do, substantive consolidation, rather than "deemed" consolidation, is the required result.  Here, the Court has found that the *Owens Corning* standard has been met.  Thus, the Court will confirm the Plan with the requirement that the Debtors' estates be substantively consolidated. True substantive consolidation requires that the separate legal entities be treated as one, with all the cumulative assets and liabilities merged or consolidated into one entity (except for inter-company liabilities, which are erased).  *In re Garden Ridge Corp.*, 386 F. Appx. 41, 43 (3d Cir. 2010).  The result is that claims against the consolidated survivor, which in this case will be S B

---

[198]*Id.* at 216.

Building, include the claims against all the Debtor entities, with all assets similarly consolidated into S B Building.

As noted, this substantive consolidation will benefit all creditors and will harm none of them, as all are to receive payment in full, even if any particular entity had insufficient assets to pay these claims.   This result is not only fair and necessary to achieve the settlements and confirmation, but is also consistent with the economic, practical and legal realities of these cases.

> (iii)    The Approval of the Global Settlement and its Cross-Collateralization and Substantive Consolidation Provisions in Connection with the Plan Are Authorized by the Bankruptcy Court's Core Jurisdiction and the Bankruptcy Code's Purpose

Further support for this Court's approval of the Plan, the Global Settlement and the cross-collateralization and substantive consolidation provisions they incorporate may be found in the Third Circuit's recent opinion in *In re Millennium Lab Holdings II, Inc.*, 945 F.3d 126 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020), where the Court upheld the Bankruptcy Court's constitutional and core bankruptcy statutory authority to grant nonconsensual third-party releases in the context of a Plan of Reorganization over the constitutional and other challenges of the affected third parties.[199]   More specifically, the Third Circuit held that the Bankruptcy Court had the constitutional authority to confirm a plan granting nonconsensual third-party releases because the releases were "integral to the restructuring of the debtor-creditor relationship" – a core function of the bankruptcy process.[200]   The releases were critical to the success of the Plan because the funding for the Plan would not be provided without them.[201] And, without that funding, the Plan

---

[199] *Id.* at 137.
[200] *Id*. at 137-140.
[201] *Id*. at 137.

Settlement that provided a significant dividend to unsecured creditors could not be consummated, the Plan could not be confirmed, and the Debtors would be forced to liquidate.[202]

Though this case and the Debtors' Plan do not involve nonconsensual third-party releases, they are based on the Global Settlement incorporated in the Plan that significantly reduces the claims of various secured creditors, provides for their payment over time, and avoids years of costly and contentious litigation that had the potential to overwhelm the Debtors' estates. The Global Settlement is integral to the Plan. Like the settlement in *Millennium*, it was heavily negotiated and allows the Debtors to proceed with their efforts to maximize the recovery to secured and unsecured creditors. Without the Plan and the Global Settlement -- and the cross-collateralization and substantive consolidation provisions they include -- there would be no Plan, secured creditors would receive only a portion of their claims and administrative priority and general unsecured creditors would receive nothing. Of course, this is a far cry from the 100% Plan for all creditors proposed by the Debtors. Thus, like the Plan Settlement in the *Millennium* case, the Global Settlement and its cross-collateralization and consolidation provisions are integral to the Plan, and the resulting recoveries to secured and unsecured creditors.

The broad authority of the Bankruptcy Court to approve settlements that advance the Bankruptcy Code's goal of promoting settlements and reorganizations, as confirmed by the Third Circuit in *Millennium*, provides further support for the approval of the subordination and cross-collateralization provisions and, in turn, the Global Settlement. In sum, the substantive consolidation (and cross-collateralization) provisions of the Global Settlement are authorized by the Bankruptcy Code, are in furtherance of its policies and objectives, and will be approved by this Court.

---

[202] *Id.* at 129.

### 7. Boraie's Argument That Payments To USLR To "Backstop" the Plan Will Constitute Fraudulent Transfers Is Premature

Boraie argues that because USLR is at least equitably insolvent -- with more than $5 million of unpaid judgment creditors -- any payments USLR makes to "backstop" the Debtors' Plan obligations would be constructively fraudulent transfers and may not be used to fund the Plan. Boraie further argues that the funds USLR uses to make these payments will come from insolvent affiliated entities, such as the rental income from 388 Route 22, a subsidiary of these Debtors, whose income was already pledged to pay that entity's creditors and which is now in Chapter 7 liquidation. Thus, Boraie argues that the transfers from those affiliated entities to USLR to fund the Debtor's Plan are constructively fraudulent based on lack of reasonably equivalent value and the insolvency of USLR and the affiliates. The Court disagrees.

First, these claims (or defenses) are premature. The payments have not yet been made by USLR (or 388 Route 22) so this Court has no ability or duty to predict that they will be avoided as fraudulent transfers without knowing the precise circumstances of each potentially fraudulent transfer. *See, e.g., In re R.M.L. Inc.,* 92 F.3d, 139, 153 (3d Cir. 1996) (determining reasonably equivalent value is a fact-sensitive inquiry requiring a review of all the relevant surrounding circumstances). Further, any such finding here would require the Court to issue an advisory opinion, which is not permitted. *See, e.g., Coffin v. Malvern Sav. Bank*, 90 F.3d 851, 853-54 (3d Cir. 1996).

Next, there are various potential defenses to the potential fraudulent transfers claims, particularly by the entities receiving the transfers, i.e., these Debtors' creditors who undoubtedly provided value for their prepetition claims against the Debtors at times when the Debtors were not in bankruptcy. Therefore, those creditors may have complete (or partial) defenses to any such fraudulent transfer claims as good faith transferees for value. *See* 11 U.S.C. §§ 548(c) and 550(b)

(Trustee may not recover from transferee that takes for value and in good faith and without knowledge of avoidability of transfer; transferee who takes in good faith and for value has a lien or may retain any interest transferred to the extent that the transferee gave value).

Further, USLR and its affiliates could similarly have potentially viable arguments that they received reasonably equivalent value because the potential equity in the Debtors is being preserved.  As has been noted by the Third Circuit, the value received by the transferring party need not be direct, tangible or even easily quantifiable.  *See In re R.M.L.,* 92 F.3d at 148-50; *see also Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992) (for example, "the ability to obtain substantial credit" and synergy expected to result from leveraged buyout may constitute reasonably equivalent value).

Thus, this Court is not prepared to determine, nor can it realistically determine, months or years in advance whether transfers that have not yet occurred are constructively fraudulent.  That fact-sensitive inquiry requires an analysis of the totality of the actual circumstances existing at the time of those transfers.  The Debtors, USLR and the future transferees (i.e., the Debtors' creditors) may very well have viable and/or dispositive defenses to such claims.  Accordingly, Boraie's argument that the "backstop" funding provided by USLR will necessarily result in constructively fraudulent transfers is overruled.

### 8. The Plan Is Fair and Equitable and Does Not Discriminate Unfairly As It Pays All Allowed Claims in Full Or As Agreed and Provides for the Same Treatment of All Similarly Situated Claims

In another argument linked to feasibility, cross-collateralization and substantive consolidation, Boraie asserts that the fair and equitable and no unfair discrimination requirements of section 1129(b) have not been met and that the Plan is therefore not confirmable.  Confirmation

under section 1129(b) is necessary according to Boraie because not all impaired classes voted to accept the Plan, as is required by section 1129(a)(8).

        (i)      The Debtors Did Not Satisfy Section 1129(a)(8) and Are Therefore
                Required to Satisfy Section 1129(b).

As a preliminary matter, the Court agrees with Boraie that notwithstanding the fact that the nonaccepting, impaired classes – the EPA, Milltown and tax lien certificate holders – did not object to the Plan, section 1129(a)(8) expressly requires affirmative acceptance or nonimpairment, neither of which is present as to these claim holders.  *See also* 11 U.S.C. § 1126(c) (which provides that with respect to any class of creditors, acceptance by two-thirds in amount and more than one-half in number of each is required); and Bankruptcy Rule 3018(c) (acceptance or rejection must be signed in writing).  Based on the Supreme Court's repeated mandate that the Bankruptcy Code be read in accordance with its plain language (unless those terms are ambiguous or would lead to an absurd result), this Court agrees with the majority of cases that hold that affirmative acceptance is required under section 1129(a)(8) and that the failure to object will not suffice.[203]  *Compare In re Augusto's Cuisine Corp.,* 2017 WL 1169537 at *7 (Bankr. D.P.R. Mar. 28, 2017); *In re Townco Realty, Inc.,* 81 B.R. 707, 708 (Bankr. S.D. Fla. 1987); *In re Vita Corp.*, 358 B.R. 749, 751 (Bankr. C.D. Ill. 2007) (all holding that, based on sections 1129(a)(8) and 1126(c) and/or Bankruptcy Rule 3018(c), affirmative written acceptance is required) with *In re Ruti-Sweetwater*, 836 F.2d 1263, 1267 (10th Cir. 1988) (holding that a failure to object may be a deemed acceptance);[204] and *In re Szostek*, 886 F.2d 1405, 1406 (3d Cir. 1989) (failure to object may be a deemed acceptance in the

---

[203] The Court acknowledges the Debtors' argument that as to the EPA and Milltown, both of which have settled with the Debtors, their agreement to settle could be deemed to be an acceptance.  It is not necessary for this Court to reach that argument, however, because other impaired classes, i.e., the tax lien certificate holders have not settled or voted to accept the Plan.  Thus, affirmative acceptance by these classes is required, and the issue of whether the settlement of claims may constitute a "deemed" acceptance is left for another day.

[204] The *Ruti-Sweetwater* case has been heavily criticized and is recognized as the minority view by COLLIER and numerous cases.  7 COLLIER ON BANKRUPTCY ¶ 1129.02 (Richard Levin & Henry J. Sommer eds., 16th ed.) and p.125 (collecting cases).

Chapter 13 context, where creditors do not vote on a plan, making this line of cases readily distinguishable).

Finally, the Ballot the Debtors mailed to creditors properly requires written acceptance (or rejection) by a date certain, in default of which "your vote will not be counted as either an acceptance or rejection of the [Plan]."[205]  Thus, confirmation of this Plan requires compliance with section 1129(b) according to the Bankruptcy Code and Rules, and the Debtors' own Ballot.

(ii)    Section 1129(b) is Satisfied

Next, Boraie argues that the Plan does not satisfy the "fair and equitable" and no unfair discrimination requirements of section 1129(b), relying principally on the asserted illegality of the substantive consolidation and cross-collateralization provisions of the Global Settlement and Plan. This Court has expressly rejected those two arguments in prior sections of this Opinion and does so again here for the same reasons.  To the extent Boraie's arguments in this regard go beyond substantive consolidation and cross-collateralization to other issues regarding feasibility (which is also discussed and fully addressed in another section of this Opinion) and general unfairness or inequity, those arguments are similarly rejected.

Here, the Court must again take note of Boraie's interests in voting against and objecting to the Plan.  While Boraie's purchase of claims in the Alsol and S B Building cases (but *not* in SB Milltown) certainly gives it standing to object in those two cases, that does not mean the Court cannot consider the circumstances surrounding its decisions to vote to reject and object to the Plan in determining whether the Plan is fair and equitable as to all creditors.

Those circumstances include the following:

- Boraie is the designated Redeveloper of the Debtors' Properties and has been deeply involved in heavily contested State Court litigation with the Debtors for almost fifteen years.

---

[205] Ex. D-6, Certification of Balloting, Dkt. No. 501.

- As represented by the Debtors on the record, and as will be required by this Court in any event, the confirmation of this Plan and implementation of its provisions will have *no* effect on the rights, claims and defenses of Boraie, Milltown and the Debtors in the State Court Litigation.

- Boraie submitted into evidence an appraisal of the combined Properties at $7.65 million, without considering environmental costs.[206] A later appraisal by Milltown submitted in the State Court litigation and to this Court valued the Debtors' Properties (again jointly, but not individually) at $1.75 million.

- Without accepting Mr. Berger's valuation of the same Properties (which he similarly did not and could not break down individually) of $20 million or more, it is obvious that Boraie would rather pay far less than what Mr. Berger believes the Debtors' Properties are worth and prefer to avoid a long and continuing fight with Mr. Berger and the Debtors in State Court over valuation and condemnation issues. Thus, it is not surprising (or necessarily inappropriate) that Boraie would rather deal with a Chapter 11 or 7 trustee in seeking to acquire the Debtors' Properties for as little as possible, as is likely if the Plan is not confirmed. Nor is it inappropriate for the Court to consider the apparent motivation for Boraie's objections in determining whether the Plan should be confirmed.

- The secured claims of Sass (at least $7.5 million, plus accruing interest before the Global Settlement and $5.5 million after) and the EPA ($5.45 million before the Global Settlement and $2.45 million with interest after) by themselves will exceed the liquidation value of the Debtors' Properties, resulting in no dividend to unsecured creditors. Thus, Boraie's objection is contrary to its interests as an unsecured creditor, as it will be in a better position as to its unsecured claims as soon as the Debtors make their first payment under the Plan. Further, under any scenario, the possibility of receiving payment in full on an unsecured claim is far better than receiving nothing as a certainty and spending substantial legal fees to achieve that result, as Boraie has undeniably done in this case.

- Further evidencing its intent to derail the Debtors' Plan without regard to any recovery on its or any other unsecured claims in these cases, Boraie argued that the Plan discriminated unfairly because the cross-collateralization of the Sass and the EPA claims (and substantive consolidation) would result in SB Milltown's creditors receiving less than they would in a liquidation. A primary problem with that argument is that Boraie is *not* a creditor of SB Milltown, and thus does not have standing or any legitimate reason to object as the treatment of SB Milltown's creditors – other than to frustrate the Debtors' Plan. See nn.168 and 184 *supra*. In

---

[206] Apr. 24, 2018 Stipulation as to admissibility of June 13, 2017 Appraisal Report of Rosin & Associates, Dkt. 502.

short, Boraie is again arguing *against* its interests as an unsecured creditor in favor of its interest as a Redeveloper who wants to pay as little as possible for the Debtors' Properties.

- Additionally, because of the difficulty in separately valuing the Properties of each Debtor (due to, *inter alia*, the uncertainty of how many units would be approved as to each lot and how the price would be allocated as against each Property), the EPA and Sass sought cross-collateralization to prevent the Debtor from gerrymandering their secured claims against a property against which either or both did not have liens. The EPA and Sass agreed to substantially reduce their secured claims (by a total of approximately $5 million) and subordinate their claims to Milltown, in exchange for the cross-collateralization and substantive consolidation that allowed the Debtors to propose a Plan that would pay unsecured creditors in full rather than receive nothing. Thus, besides its lack of standing to make this objection as to SB Milltown, Boraie's forceful objections to relief that would allow its unsecured claims to be paid in full (or even in part) is directly in conflict with interests as a creditor—and the interests of all other creditors in this case. The only plausible explanation for Boraie's vehement objections is that it is advancing its interests as a Redeveloper, whose motivation understandably and inevitably runs counter to the interests of *all* Debtors' creditors, secured and unsecured, including Boraie.

For these reasons, the Court determines that Boraie's objections based on the Plan not being fair and equitable are motivated not by its status as a unsecured creditor (where it would benefit from the Plan's treatment), but as a Redeveloper who is willing to forego any recovery on its relatively small unsecured claim in exchange for the opportunity: (i) to pay millions of dollars less for the Debtors' Properties; and (ii) to end years of costly and time-consuming litigation with Mr. Berger and co-Debtors.

Turning to the fair and equitable requirement of section 1129(b)(2)(B) with respect to a class of unsecured creditors of which Boraie is part, the Plan satisfies subsection (i)'s requirement that the holder of such unsecured claims will "receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim." In this case, that treatment is payment in full with interest. As was noted previously, it is for these same

reasons that the Plan does not violate the absolute priority rule, as embodied in subsection (ii) of section 1129(b)(2)(B).

In rejecting Boraie's unfair and inequitable arguments, the Court finds that it is Boraie's objections to the Plan, if sustained, that would result in unfair and inequitable treatment of unsecured creditors, who would receive nothing in the event of liquidation.  Instead, under the Plan, general unsecured creditors have the prospect of payment in full, with partial payments beginning as soon as three months after the Plan's Effective Date.  Undoubtedly, that is why unsecured creditors either voted in favor of the Plan or did not object.  And as is certainly appropriate in determining whether section 1129(a) and (b)'s "fair and equitable" requirements have been met, this Court will give far more -- and indeed dispositive -- weight to the will of the overwhelming majority of unsecured creditors, rather than that of a single unsecured creditor acting against the best interests of other unsecured creditors.  Besides the fact that Boraie will be paid on its claim, the unfairness and inequity of Boraie's position is further highlighted by the fact that if the Plan is confirmed, Boraie's rights in the State Court Litigation will be unaffected.  Thus, Boraie's interests as Redeveloper are not in any way being adversely impacted by the Plan.

In sum, the Plan not only provides for the same treatment for all similarly situated creditors, but also proposes to pay those creditors in full, with interest.  That treatment satisfies the fair and equitable requirement of section 1129(b)(2)(B) with respect to the claims of unsecured creditors, including Boraie (in its capacity as such).   Section 1129(b)(2)(A) is satisfied as to secured creditors, who are retaining their liens and also receiving payment in full of their claims as asserted or settled, with interest.[207]  For all these reasons, Boraie's objections to confirmation based on 11 U.S.C. § 1129(b) are overruled.

---

[207] Here again, as an unsecured creditor, Boraie has no standing to object to the treatment of secured creditors under section 1129(b)(2), who either voted in favor of the Plan, settled with the Debtors or did not object.

**9. The Sass Settlement, the Milltown Settlement and the Global Settlement Are Approved Pursuant to 11 U.S.C. § 1123(b)(3) As Fair, Reasonable and in the Best Interest of Creditors**

As noted, the cornerstone of the Debtors' Plan is the Global Settlement, which includes settlements with the EPA, Sass and Milltown and the Sass Settlement. These settlements resolve multiple, long-standing, complicated and hotly contested litigations and disputes between and among the key parties in these cases. Though not directly challenged by Boraie, the legality of these settlements was called into question principally on the basis of the substantive consolidation and cross-collateralization provisions described and approved above. Because of the separate and substantial additional benefits they provide, the Court will also separately analyze the settlements and approve them on the basis of the *Martin* standards, including particularly that the settlements are in the best interests of all creditors (in their capacity as such), and as further supporting the fundamental goals of Chapter 11 including in rehabilitating these Debtors, encouraging compromises and providing for a significant return to creditors.

To summarize, at least the following litigations or controversies described below are being resolved pursuant to the Global Settlement and the related separate settlements with Sass and Milltown:

State Court Litigation

(i) *S B Building Associates, L.P., et al. v. Borough of Milltown, et al.* (MID-L-9439-06). This action was commenced in 2006 and related to the development and redevelopment of the Debtors' Properties, including Mount Laurel development and condemnation.

(ii) *S B Building Associates, L.P., et al. v. The Planning Board of Milltown, et al.* (MID-L-7215-13).

(iii) These cases spawned appeals to New Jersey's Appellate Division and at least one petition for certification to the New Jersey Supreme Court.

EPA Litigation and Claims:

(i) *United States v. Alsol Corp., et al.*, Case No 2:09-cv-03025 (D.N.J.). Settlement resolves the Debtors' default under a Consent Decree ("Alsol I") and the Judgment obtained by the EPA against USLR for $896,751.79.

(ii) *United States v. Alsol Corp. et al.*, Case No. 2:13-cv-00380 (D.N.J.) ("Alsol II") in which the EPA sought recovery of removal costs related to the Properties from the Debtors under CERCLA. This litigation involved extensive discovery, motion practice and appeals. The settlement reduces the EPA's total claim by approximately $3 million from $5.5 million to $2.45 million with payments over six years under the Plan. The Alsol I Judgment will also be resolved, with Mr. Berger guaranteeing the full settlement amount of $2.45 million.

(iii) *Proof of Claims Dispute*. The EPA filed a disputed secured proof of claim in the amount of $3,439,764 in these cases and asserted a lien on all the Debtors' Properties for that full amount based on *inter alia* alter ego and veil-piercing theories. This claim is also resolved pursuant to the Global Settlement.

(iv) *Lien Priority Litigation*. This case was commenced by the EPA in this Court against Sass and Milltown (Adv. Pro. No. 15-2149). Here, the EPA challenged the priority of the respective liens of Sass and Milltown, asserting that its CERCLA lien was prior to both. The Debtors intervened and the New Jersey State League of Municipalities appeared *amicus curiae*. This complicated three-way priority dispute is also being resolved pursuant to the Global Settlement.

(v) *Motion for Appointment of Trustee*. The EPA also sought the appointment of a Chapter 11 Trustee in these cases that was vigorously opposed by the Debtors. The EPA withdrew that motion as part of the Global Settlement.

Sass Litigation and Claims

(i) *Tax Sale Certificate Foreclosures*. Early in these cases, Sass sought relief from stay so it could proceed with the foreclosure of the tax sale certificates it acquired. Those foreclosure actions were the impetus for the Debtors' bankruptcy filings and are being resolved pursuant to the Sass and Global Settlements.

(ii) *Bid-Rigging Litigation*. The Debtors commenced their own litigation against Sass in this Court (Adv. Pro. No. 14-1582). This action challenged the validity of Sass's claims on various grounds, including the amount and validity of those claims which included antitrust and RICO causes of action, and sought forfeiture of Sass's claims. Motions and cross-motions for

summary judgment were filed and adjourned while the parties mediated with former District Judge Orlofsky and then continued negotiations among themselves. As part of the Global Settlement, Sass agreed to reduce its secured claim from approximately $7.5 million at the Petition Date (and over $8 million currently) to $5.5 million and agreed to payments over six years, with no interest for a 27-month period and then a reduced interest rate of 12% (from 18%). Sass also agreed that the liens of Milltown and the EPA are senior to its liens.

Tax Settlement with Milltown

The Debtors and Milltown entered into a Term Sheet that resolves Milltown's pre- and post-petition/preconfirmation real estate tax claims and the Debtors' pending 2016 and 2017 tax appeals, with payment due in installments over five years.[208]

Motions to approve all these settlements were made by the Debtors but objected to by Boraie and, at times, various other parties. The objections included arguments that the settlements and Global Settlement were *sub rosa* plans that should be considered as part of the Plan confirmation process. This Court agreed and deferred consideration of the settlements until Plan confirmation. We are now at confirmation, and the Court will approve those settlements for the self-evident reasons that follow.

Before setting out the law relating to standards that must be met to approve the settlements, the Court re-emphasizes the obvious and substantial benefits that are derived from these settlements. They end years of multiparty, complex and costly litigation. The Debtors' savings based on the Sass and EPA Settlements are well in excess of $5 million (at least $2.5 million as to Sass and approximately $3 million as to the EPA). These Settlements and the related savings allowed the Debtors to propose a Plan that proposed to pay secured and unsecured creditors in full, with interest. In contrast, if the settlements are not approved, all parties will likely be returned to their previous positions, the settlements will not become effective, the reduced claims will return

---

[208] See Ex. D-3.

to their pre-settlement amounts and all these litigations will be reinstated.[209] As a result, any hope for recovery by unsecured creditors would be lost.

In this Court's view, this is an instance of *res ipsa loquitur*, i.e., the thing speaks for itself. The benefits of these settlements to all creditors and equity holders not only speak for themselves in terms of substance and the propriety of their approval, but also highlight that the true motivation for Boraie's substantial and vigorously pursued objections is not its position as an unsecured creditor, but its conflicting interests as Redeveloper.

These settlements, including the Global Settlement, were previously brought to the Court for approval under Bankruptcy Rule 9019. As noted, the Court determined to defer approval until the Plan confirmation process, so that it could address the objections that the settlements generally and cross-collateralization and consolidation provisions specifically were unlawful and constituted a *sub rosa* plan. Those objections are now being addressed and overruled.

The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3). Settlements and compromises are "a normal part of the process of reorganization." *Protective Com. for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) *quoting Case v. Los Angeles Lumber Prods. Co.,* 308 U.S. 106, 130 (1939). Though these Supreme Court cases predated the enactment of the Bankruptcy Code in 1978, their core principles not only survive but are central components of the reorganization process, as now embodied in Bankruptcy Rule 9019 and section 1123(b)(3).

A decision to approve or reject a proposed compromise or settlement falls within the court's sound discretion. *Key3 Media Grp., Inc. v. Pulver.com, Inc. (In re Key3 Media Grp., Inc.),*

---

[209] See, e.g., Global Settlement, Ex. D-2, ¶ 6 (settlement is effective upon entry of Order confirming Plan that incorporates Global Settlement); ¶ 9 (Global Settlement agreement is null and void if Chapter 11 Trustee is appointed); ¶ 10 (if Plan is not confirmed prior to January 1, 2019, any party may withdraw; however, no party has withdrawn in the intervening period of almost two years).

336 B.R. 87, 92 (Bankr. D. Del. 2005); *see also In re Louise's, Inc*., 211 B.R. 798, 801 (D. Del. 1997). When exercising such discretion, the bankruptcy court must determine whether the compromise is "fair, reasonable, and in the best interests of the estate." *Key3 Media Grp.*, 336 B.R. at 92; *see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.),* 283 F.3d 159, 165 (3d Cir. 2002); *In re Louise's, Inc*., 211 B.R. at 801; *In re Marvel Entm't Grp., Inc*., 222 B.R. 243, 249 (Bankr. D. Del. 1998).

Courts have consistently recognized that plan settlements under Section 1123(b)(3) of the Bankruptcy Code should be evaluated under the same "fair, reasonable and in the best interests of the estate" standard applicable to Bankruptcy Rule 9019 settlements. *E.g., In re Aleris Int'l, Inc.,* 2010 WL 3492664, at *18 (Bankr. D. Del. May 13, 2010); *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.),* 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("[i]rrespective of whether a claim is settled as part of a plan pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same"), *aff'd*, 68 F.3d 26 (2d Cir. 1995); *In re Drexel Burnham,* 138 B.R. at 758-59 (approving Plan that included substantive consolidation).

In evaluating whether a proposed settlement is fair and equitable, courts in the Third Circuit consider the following four factors: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attendant thereto; and (d) the paramount interests of the creditors and a proper deference to their reasonable opinions. *See Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996); *Aleris Int'l,* 2010 WL 3492664, at *19; *Key3 Media Grp.*, 336 B.R. at 93; *In re Marvel*, 222 B.R. at 249. To properly balance these values, the Court should consider all factors "relevant to a full and fair assessment of the wisdom of the

proposed compromise." *In re Marvel*, 222 B.R. at 249 (*quoting TMT Trailer Ferry, Inc.*, 390 U.S. at 424).

Here, for the reasons previously stated, the settlements and the Global Settlement easily satisfy these standards.  Years of complex and costly multiparty litigations whose results were uncertain are being resolved.  Further discovery, motion practice and likely appeals are avoided. The settlements will not only end the substantial cost, uncertainty and delay inherent in litigation, but also result in substantial reductions of the secured claims against the Debtors (by more than $5 million), with those reduced claims being paid over time.  And, as was also noted and as is of paramount importance, the interests of creditors are best served by these settlements as they allow them an opportunity for not only a recovery, but also payment in full of their claims, rather than no recovery at all for unsecured creditors if the Debtors are liquidated.  That the best interests of creditors are being served is further and amply demonstrated by their overwhelming approval of the Plan.  Similarly, the interests of the estate and Debtors are well served by these settlements as they provide them with the ability to reorganize, pay creditors and attempt to protect their perceived equity in the Properties.  Accordingly, the Global, Sass and Milltown Settlements are approved, and the objections to those Settlements are overruled.

## VI.  **CONCLUSION**

For all the foregoing reasons, the Debtors' Fourth Modified Plan of Reorganization is confirmed, subject to and conditioned upon the following modifications and specifications:

1.      The Debtors' estates shall be substantively consolidated into S B Building. The substantive consolidation of the Debtors shall be actual, and their respective assets and liabilities (except for inter-company liabilities) shall be combined.  There shall be no "deemed" substantive consolidation.

72

2.      The treatment of all and each class of general of unsecured creditors shall be amended to include the following default provision:

> Event of Default:  The following shall constitute an event of default solely as to the A9, B6, and C8 Classes of Claims: the failure to make any payment to any holder of a Class A9, B6 and C8 Claims when due, which Default is not cured within thirty (30) days after the receipt of Notice of Default from the holder of any such claim by the consolidated Debtors (the "Classes A9, B6 and C8 Cure Period") in accordance with the Plan (the "Event of Default").  Upon the occurrence of an Event of Default and expiration of the Class A9, B6 or C8 Cure Period: (i) all obligations of the Debtors to the Class A9, B6 or C8 creditor whose claim is in default, including principal, accrued and unpaid interest, shall accelerate and become immediately due and payable; and (ii) the holder or holders of any such Class A9, B6 and C8 claim shall be permitted to avail themselves of all remedies available under state law, the Bankruptcy Code and this Plan.

3.      All allowed Administrative Claims shall be paid on the Effective Date or as otherwise may be agreed by the applicable administrative claim holder.  The escrow in the amount of $1.1 million held by Debtors' counsel in connection with the case of *In re Fin Associates* (Case No 19-28386) shall be available to pay such Administrative Claims.

4.      The Plan is modified to reflect and incorporate the revised commitment letter from United States Land Resources to the Debtors, marked and admitted into evidence as Exhibit D-8.

5.      The respective rights, remedies, claims and defenses of the Debtors, Boraie, Milltown and any and all other parties involved in the State Court Litigation (as defined in this Opinion) are unaffected by the Plan and the Confirmation Order, and all such rights, remedies, claims and defenses are expressly preserved with respect to any and all such parties. [210]

---

[210] To the extent that the individual requirements for confirmation in section 1129(a) and (b) are not specifically addressed in this Opinion, the Court determines that those requirements were satisfied for the reasons set forth in the Debtors' Memorandum of Law in Support of an Order Confirming their Plan [Dkt. No 637], and any remaining objections that are not specifically discussed in this Opinion are overruled on that basis.  Further, to the extent that Boraie and/or the UST did not object to these other Plan confirmation requirements in their post-hearing submissions, those objections are waived.  *See, e.g., In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 291-92 (Bankr D. Del. 2017), *aff'd*, 591 B.R. 559 (Bankr. D. Del. 2018), *aff'd*, 945 F.3d 126 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020).

A separate Order confirming the Debtors' Fourth Modified Plan with these conditions is

being entered by the Court.


Dated: November 6, 2020                              *Vincent F. Papalia*
                                                     VINCENT F. PAPALIA
                                                     United States Bankruptcy Judge